**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-0736-JLK

STATE OF COLORADO,

     Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE, and
WILLIAM PELHAM BARR, in his official capacity as
Attorney General of the United States,

     Defendants

---

**DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT**

---

Defendants United States Department of Justice and William P. Barr, in his official capacity as Attorney General of the United States, hereby move to dismiss the Amended Complaint in this matter pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, move for summary judgment on all claims pursuant to Fed. R. Civ. P. 56. The grounds supporting this motion are set forth in the following memorandum.

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS......................................5

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................12

    I.    The Immigration and Nationality Act ............................................12

    II.    DOJ's Office of Justice Programs and the Byrne JAG Program ................14

    III.    Congressional Action and the Multi-Year History of Special
        Conditions in the Byrne JAG Program. ........................................16

    IV.    The Conditions Challenged in this Litigation ...............................20

ARGUMENT..................................................................................................22

    I.    The Challenged Immigration Conditions in the Byrne JAG
        Program Do Not Violate the Separation of Powers.....................22

        A.    The Conditions are Authorized by 34 U.S.C. § 10102(a)(6)...............23

        B.    The Conditions are Authorized by 34 U.S.C. § 10153. .......................26

    II.    The Challenged Immigration Conditions Do Not Violate the
        Spending Clause. ........................................................................27

        A.    The Conditions are Sufficiently Related to the Purposes of
            the Byrne JAG Program.......................................................28

        B.    The Conditions are Clear and Unambiguous. .....................................33

    III.    The Challenged Immigration Conditions are Reasonable and Do
        Not Violate the Administrative Procedure Act. ............................35

        A.    The Challenged Conditions are Not *Ultra Vires*................................35

        B.    The Conditions Do Not Violate 34 U.S.C. § 10228(a)........................35

        C.    The Challenged Conditions are Reasonable. .....................................37

IV.   Sections 1373 and 1644 are Consistent with the Tenth
      Amendment. ............................................................................................ 44

      A.    The Constitutionality of Sections 1373 and 1644 Need Not
            be Decided by this Court. ................................................................ 44

      B.    The Sections Validly Guard Against Frustration of the
            Federal Immigration Statutory Design. ............................................ 45

      C.    The Sections are Constitutional under *Murphy v. NCAA*
            and other Controlling Precedent ...................................................... 47

V.    Plaintiff is Not Entitled to Declaratory, Mandamus, or Injunctive
      Relief. ..................................................................................................... 50

CONCLUSION ............................................................................................. 52

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Idaho Falls Sch. Dist. No. 91*,
  291 F. Supp. 3d 1162 (D. Idaho 2017) ....................................................................... 51

*Alliance for Open Society Intern., Inc. v.*
  *U.S. Agency for Intern. Development*,
  651 F.3d 218 (2d Cir. 2011) ......................................................................................... 28

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*,
  809 F.2d 979 (3d Cir. 1986) ......................................................................................... 22

*Arizona v. United States*,
  567 U.S. 387 (2012) ...........................................................................................*passim*

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ...................................................................................................... 28

*Barbour v. Wash. Metro. Area Transit Auth.*,
  374 F.3d 1161 (D.C. Cir. 2004) .................................................................................... 29

*Bell v. Reno*,
  218 F.3d 86 (2d Cir. 2000) ........................................................................................... 24

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) .................................................................................... 34

*California v. Sessions*,
  284 F. Supp. 3d 1015 (N.D. Cal. 2018) ....................................................................... 31

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ........................................................................................ 34

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...................................................................................................... 38

*City of Los Angeles v. Barr*,
  No. 18-55599 (9th Cir. July 12, 2019) .................................................................*passim*

*Clinton v. City of N.Y.*,
  524 U.S. 417 (1998) ...................................................................................................... 22

*DKT Mem'l Fund Ltd. v. AID*,
  887 F.2d 275 (D.C. Cir. 1989) ............................................................................... 3, 22

*Duvall v. Atty. Gen. of U.S.*,
  436 F.3d 382 (3d Cir. 2006) ............................................................. 32

*Ely v. Velde*,
  451 F.2d 1130 (4th Cir. 1971) .......................................................... 36

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009) .............................................................. 5, 40, 42

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ........................................................................ 51

*Inland Empire-Immigrant Youth Collective v. Nielsen*,
  No. EDCV172048PSGSHKX,
  2018 WL 1061408 (C.D. Cal. Feb. 26, 2018) .................................. 51

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ..................................................................... 32

*Johnson v. Consumerinfo.com, Inc.*,
  745 F.3d 1019 (9th Cir. 2014) ........................................................ 24

*Koslow v. Pennsylvania*,
  302 F.3d 161 (3d Cir. 2002) ........................................................... 29

*Madison v. Virginia*,
  474 F.3d 118 (4th Cir. 2006) .......................................................... 28

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ............................................... 4, 28, 29

*Murphy v. National Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) ....................................................... 45, 47, 48

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .................................................................. 25, 27

*New York v. United States*,
  505 U.S. 144 (1992) .................................................................. 28, 45

*Niken v. Holder*,
  556 U.S. 418 (2009) ....................................................................... 51

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ......................................................................... 50

*Padilla v. Kentucky*,
  559 U.S. 356 ................................................................................... 32

*Printz v. United States,*
    521 U.S. 898 (1997) ................................................................................ 46, 49, 50

*Providence Yakima Med. Ctr. v. Sebelius,*
    611 F.3d 1181 (9th Cir. 2010) ............................................................................. 38

*Reno v. Condon,*
    528 U.S. 141 (2000) ............................................................................................... 50

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ............................................................................................... 48

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................................... 4, 28, 33

*United States v. House of Representatives of the United States,*
    556 F.Supp.150 (D.C. Cir. 1983) ........................................................................ 45

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) ................................................................................................... 51

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1 ................................................................................... 27

## Statutes

5 U.S.C. § 552 (b)(7) .............................................................................................. 39

8 U.S.C. § 1101 ........................................................................................................ 12

8 U.S.C. § 1226(a) ................................................................................................... 46

8 U.S.C. § 1226(c) ..................................................................................... 32, 43, 46

8 U.S.C. § 1226(d) ................................................................................................... 44

8 U.S.C. § 1227 ............................................................................................... *passim*

8 U.S.C. § 1231 .............................................................................................. 21, 46

8 U.S.C. § 1231(i) .................................................................................. 8, 40, 44, 52

8 U.S.C. § 1252c ............................................................................................... 13, 14

8 U.S.C. § 1306 ........................................................................................................ 13

8 U.S.C. § 1324 ............................................................................................... 13, 20

8 U.S.C. § 1357 ........................................................................... 13, 21, 43, 44

8 U.S.C. § 1366 ........................................................................................... 13

8 U.S.C. § 1373 ..................................................................................... 44, 47

8 U.S.C. § 1644 ............................................................................................ 44

18 U.S.C. § 1071 ......................................................................................... 20

25 U.S.C. § 1644(b) .................................................................................... 24

34 U.S.C. § 10101 ....................................................................................... 14

34 U.S.C. § 10102(a)(1) ............................................................................. 29

34 U.S.C. § 10102(a)(2) ...................................................................... 4, 29, 39

34 U.S.C. § 10102(a)(6) ......................................................................... *passim*

34 U.S.C. § 10151 ....................................................................................... 15

34 U.S.C. § 10152(a)(1) ......................................................................... *passim*

34 U.S.C. § 10153(A)(4) .................................................................. 16, 26, 27, 39

34 U.S.C. § 10153(A)(5)(C) ..................................................................... 16, 27

34 U.S.C. § 10153(A)(5)(D) ................................................................ 16, 26, 27

34 U.S.C. § 10156 ....................................................................................... 15

34 U.S.C. § 10221(a) .................................................................................. 16

34 U.S.C. § 10228(a) .................................................................................. 35

34 U.S.C. § 10251 ............................................................................. 15, 30, 38

34 U.S.C. § 1231(a)(1)(A) ......................................................................... 33

42 U.S.C. § 1395l(t)(2)(E) ......................................................................... 24

42 U.S.C. § 2000d-4a .................................................................................. 21

42 U.S.C. § 3712(a)(6) ......................................................................... 17, 23

42 U.S.C. § 713(a)(1)(C)(i) ........................................................................ 24

Consolidated Appropriations Act,
   Pub. L. No. 111-117, Div. B, Title II, 123 Stat. 3034 (2010) ...................................... 19

Consolidated Appropriations Act,
  Pub. L. No. 114-113, Div. B, Title II, 129 Stat. 2242 (2016) ...................................... 19

Consolidated Appropriations Act,
  Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135 (2017) ......................................... 19

Consolidated Appropriations Act,
  Pub. L. No. 115-141, Div. B, Title II, 132 Stat. 348 (2018) .................................. 20, 51

Pub. L. No. 90-351, 82 Stat. 197 (1968) ........................................................... 14, 16, 39

Pub. L. No. 115-31, 131 Stat. 135 (2017) ...................................................................... 15

**Other Authorities**

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (2015) ...................................................... 18

Exec. Order No. 13,809, 82 Fed. Reg. 41499 (2017) .................................................... 18

H.R. Rep. No. 104-725 (1996) ...................................................................................... 47

H.R. Rep. No. 109-233 (2005) ............................................................................... 19, 23

Marial Alper, Mathew R. Durose, & Joshua Markman,
  *2018 Update on Prisoner Recidivism: A 9-Year Follow-UP Period (2005-2014)*,
  Bureau of Justice Statistics (May 23, 2018),
  https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6266. .............................................. 31

**Regulations**

2 C.F.R. § 200.210(b)(1)(ii) ............................................................................................ 16

2 C.F.R. § 200.300 ................................................................................................. 15, 25

2 C.F.R. § 2800.101 ...................................................................................................... 15

8 C.F.R. § 287.5 .................................................................................................... 21, 43

## INTRODUCTION

This case asks whether the federal government—when it provides federal grants to state and local law enforcement—may impose conditions to ensure that the recipients are not using government funds to frustrate the federal government's law enforcement priorities and prerogatives.  Here, plaintiff challenges the authority of the U.S. Department of Justice ("DOJ" or "Department") to condition the receipt of certain federal law enforcement grants on the sharing of information about individuals whom state or local law enforcement agencies have already taken into criminal custody for public safety reasons.  In other words, plaintiff effectively argues that it should be permitted to reap the benefit of federal grant funds while ignoring the modest and lawful conditions that accompany them.  Yet, plaintiff's challenge to DOJ's authority has no coherent limiting principle, and if it succeeds, would mean that DOJ has *no* authority to apply conditions to this particular grant program—something it has done for more than a decade without objection from plaintiff.

The Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") provides federal funds for state and local law enforcement.  In furtherance of the Immigration and Nationality Act ("INA") and the statutes governing the Byrne JAG Program, DOJ requires Byrne JAG grantees to give federal law enforcement authorities access to any correctional facilities that receive funds under the grant to meet with criminal aliens the federal government suspects are in the country illegally and are deportable.  This condition reflects the federal government's preference to conduct immigration enforcement in the controlled confines of a correctional facility for the safety of both federal agents and the community at large, and it is consistent with longstanding

traditions of comity and cooperation between federal, state, and local law enforcement agencies.

DOJ also requires Byrne JAG grantees to notify federal authorities "as early as practicable" before the scheduled release of a known or suspected deportable alien from custody.  DOJ requires grant recipients to refrain, within the funded program, from prohibiting or restricting the exchange of immigration information with federal immigration authorities.  Additionally, DOJ requires grantees to agree to safeguard the confidentiality of sensitive law enforcement information, in an effort to avoid advance public disclosure of tactical law enforcement operations.  Finally, DOJ requires reporting from grantees (or any sub-grantees) if the program funded under the grant is subject to local laws or rules that restrict the sharing of immigration information with federal officials.  All of these conditions apply only to the programs or activities that receive federal financial assistance under the Byrne JAG award, all are justified by statutory authority, and all are reasonably related to the Byrne JAG's focus on improving public safety and criminal justice across the nation.

The call for intergovernmental law enforcement cooperation embodied in these conditions follows from recognition that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012).  For aliens who commit crimes and end up in state or local criminal custody, both the need for, and the expectation of, cooperation is particularly evident.  In deference to a state or local jurisdiction's significant interest in punishing individuals who violate state or local law, the INA usually permits these aliens to serve their entire sentence before being subject to federal detention for possible removal from

the country.  But while delaying removal of these individuals allows state and local jurisdictions to ensure that their own criminal justice interests are served, it was certainly not Congress's intent that, by respecting the initial need for local punishment for local crimes, criminal aliens would evade federal immigration authorities.  Thus, this complex statutory scheme contemplates that in exchange for being given priority to vindicate state interests in prosecuting state crimes, states will not hide from federal immigration officials information regarding the whereabouts, custody, and release status of aliens in state and criminal custody or otherwise frustrate the equally important federal interest in enforcing the immigration laws.

The plaintiff alleges that DOJ lacks authority to impose these grant conditions, and that they violate the Spending Clause, the Administrative Procedure Act ("APA"), and the Tenth Amendment.  All of these claims are without merit.

Congress has granted DOJ sufficient and broad authority to impose these conditions.  In the very same enactment that created the current Byrne JAG Program in 2006, Congress explicitly delegated to the Assistant Attorney General ("AAG") for DOJ's Office of Justice Programs ("OJP") the authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).  This express delegation conveys ample authority to impose the challenged conditions, which do not, accordingly, violate the constitutional separation of powers.  *See City of Los Angeles v. Barr*, No. 18-55599, Slip. Op at 11, 18 n.6 (9th Cir. July 12, 2019) (reversing an injunction imposed on separation-of-powers grounds and upholding statutory delegation to the Executive to impose terms and conditions on

federal spending programs)[1]; *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).  For the past 13 years, OJP has used this precise authority to apply a multitude of conditions to the Byrne JAG program, and each year, Congress has continued to appropriate funds for the program, typically with riders that alter the governing statutory scheme.  None of these riders (and none of these appropriations acts), however, has indicated the slightest disapproval of OJP's exercise of this statutory authority.  This indicates that OJP is properly exercising the authority delegated by Congress.

The plaintiff's Spending Clause claim similarly fails, as the challenged conditions bear much more than "some relationship" to the purposes of the Byrne JAG Program, and thus meet the relatedness element of the Spending Clause.  *See, e.g.*, *City of Los Angeles*, No. 18-55599, Slip. Op at 15-20; *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).  OJP and the grant programs it administers are designed to strengthen law enforcement and to "maintain liaison" among the various branches of government "in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2).  The challenged conditions emanate from "the Department of Justice's top priority of reducing violent crime" and further the "long-established cooperative principles among law enforcement agencies."  *See* Administrative Record ("AR") at AR-00992 (DOJ Press Release No. 17-826 (July 25, 2017)).[2]  The conditions are also unambiguous.  *See South Dakota v. Dole*, 483 U.S. 203, 210 (1987).

---

[1] A copy of this recent opinion is available at: http://cdn.ca9.uscourts.gov/datastore/opinions/2019/07/12/18-55599.pdf.

[2] The Administrative Record was filed on July 30, 2019, as ECF No. 25.

Similarly, plaintiff's APA claims fail.  DOJ has sufficient statutory authority to promulgate these conditions.  Given DOJ's determination that enforcement of federal immigration law improves public safety and criminal justice across the nation – a determination that was recently found to be rational and reasonable by the Ninth Circuit in *City of Los Angeles*, No. 18-55599, Slip. Op at 23 – the conditions easily survive arbitrary-and-capricious analysis.

Finally, plaintiff's Tenth Amendment challenge to 8 U.S.C. §§ 1373 and 1644 is inapposite because the Byrne JAG grant conditions at issue here merely incorporate, by reference, some terms contained in those statutes and do not enforce the statutes themselves.  Moreover, the grant conditions that incorporate those terms in those statutes apply only to the programs or activities that receive federal financial assistance under the Byrne JAG award—not to the grantees, proper, or *in toto*, and in no sense are they coercive.  Finally, plaintiff's challenge must also fail because these statutes permissibly regulate information-sharing regarding private actors in the immigration context, a context where federal authority is at its zenith.  Because these statutes do not improperly infringe on state autonomy, there is no constitutional violation.

For these reasons and for those explained below, the Court should grant defendants' motion to dismiss plaintiff's Amended Complaint, or alternatively, to grant summary judgment to the defendants on all counts.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Document Authentication

1.  A true and accurate copy of the Administrative Record ("AR") in this matter was filed on July 30, 2019.

2.  A true and accurate copy of the Byrne JAG award package issued by the Office of Justice Programs ("OJP") of the U.S. Department of Justice to the State of Colorado's Division of Criminal Justice for Fiscal Year 2006 is attached hereto as Exhibit 1(A) and authenticated by the Declaration of Tracey Trautman, ¶ 2, attached hereto as Exhibit 1 ("Trautman Declaration").

3.  A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Division of Criminal Justice for Fiscal Year 2007 is attached hereto as Exhibit 1(B) and authenticated by the Trautman Declaration, ¶ 3.

4.  A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Division of Criminal Justice for Fiscal Year 2008 is attached hereto as Exhibit 1(C) and authenticated by the Trautman Declaration, ¶ 4.

5.  A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Division of Criminal Justice for Fiscal Year 2009 is attached hereto as Exhibit 1(D) and authenticated by the Trautman Declaration, ¶ 5.

6.  A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Division of Criminal Justice for Fiscal Year 2010 is attached hereto as Exhibit 1(E) and authenticated by the Trautman Declaration, ¶ 6.

7. A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Department of Public Safety for Fiscal Year 2011 is attached hereto as Exhibit 1(F) and authenticated by the Trautman Declaration, ¶ 7.

8. A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Department of Public Safety for Fiscal Year 2012 is attached hereto as Exhibit 1(G) and authenticated by the Trautman Declaration, ¶ 8.

9. A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Department of Public Safety for Fiscal Year 2013 is attached hereto as Exhibit 1(H) and authenticated by the Trautman Declaration, ¶ 9.

10. A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Department of Public Safety for Fiscal Year 2014 is attached hereto as Exhibit 1(I) and authenticated by the Trautman Declaration, ¶ 10.

11. A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Department of Public Safety for Fiscal Year 2015 is attached hereto as Exhibit 1(J) and authenticated by the Trautman Declaration, ¶ 11.

12. A true and accurate copy of the Byrne JAG award package issued by OJP to the State of Colorado's Department of Public Safety for Fiscal Year

2016 is attached hereto as Exhibit 1(K) and authenticated by the

Trautman Declaration, ¶ 12.

### Development of the Challenged Immigration Conditions

13. In 2007, the OIG conducted a congressionally-mandated audit concerning

   the cooperation of State Criminal Alien Assistance Program recipient

   jurisdictions in the removal of criminal aliens from the United States. *See*

   AR-00001-00109 (Cooperation of SCAAP Recipients in the Removal of

   Criminal Aliens from the United States).

14. In conducting this audit, the OIG "interviewed ICE officials to obtain their

   views, distributed a questionnaire to 164 SCAAP recipients, and

   conducted independent testing in 7 jurisdictions that received SCAAP

   funding" under 8 U.S.C. § 1231(i). *Id.* at AR-00005.

15. Relevant to compliance with 8 U.S.C. § 1373, the audit reported that "[t]he

   99 jurisdictions that responded to the questionnaire stated almost

   unanimously that there was no legislation or policy impeding the ability of

   local officers and agencies to communicate with ICE on immigration-

   enforcement matters." *Id.* at AR-00011.

16. The 2007 OIG Audit observed broadly that "many state, county, and local

   law enforcement agencies are unwilling to initiate immigration

   enforcement but have policies that suggest they are willing to cooperate

   with ICE when they arrest individuals on state or local charges and learn

   that those individuals may be criminal aliens." *Id.* at AR-00022-23.

17. Nine years later, on May 31, 2016, the OIG issued a report in response to a request by OJP to examine allegations of potential violations of Section 1373 by grant recipients.  *See* AR-00366-00381.

18. This 2016 review found deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States."  *Id.* at AR-00366-67 n.1.

19. The 2016 OIG Report advised that "the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago" when, in the 2007 OIG Audit, federal immigration authorities had "commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions, except for [one jurisdiction]" that were examined.  *Id.*

20. The 2016 OIG Report found that "each of the 10 jurisdictions" surveyed "had laws or policies directly related to how those jurisdictions could respond to ICE detainers, and each limited in some way the authority of the jurisdiction to take action with regard to ICE detainers."  *Id.* at AR-00369.

21. Examining various jurisdictions' policies, the OIG stated that, "based on our discussions with ICE officials about the impact these laws and policies were having on their ability to interact with local officials, as well as the information we have reviewed to date, we believe these policies and others like them may be causing local officials to believe and apply the

policies in a manner that prohibits or restricts cooperation with ICE in all respects," which "would be inconsistent with and prohibited by Section 1373." *Id.* at AR-00373.

22. The OIG Report expressly recommended that DOJ "[r]equire grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support the certification." *Id.* at AR-00374.

23. After the 2016 OIG Report, the Department of Justice under the Obama Administration introduced a Byrne JAG requirement during the Fiscal Year 2016 cycle to certify compliance with Section 1373. *See* AR-00384 (July 7, 2016 OJP Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program).

24. The Department of Justice issued a press release on July 25, 2017, entitled "Backgrounder on Grant Requirements," that states that the three immigration conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe." AR-00993.

### The Importance of State-Federal Cooperation
### Regarding Immigration Enforcement

25. Reducing criminal gang activity and violence improves public safety. AR 01481-83.

26. Coordination among different levels of law enforcement – federal, state, and local – strengthens efforts to fight criminal gangs and to reduce gang violence.  AR01481-83.

27. Transnational gangs such as MS-13 and M-18 contribute significantly to the level of violent crime.  AR00621, AR 00744, AR01419, AR01485.

28. Transnational gangs tend to be criminally active and operational in more than one country and to maintain connections across international borders.  Members of a transnational gang in one country sometimes commit crimes that have been substantially planned, directed, or controlled by the gang's leaders in another country.  AR01419.

29. The Department of Justice believes that improving coordination among federal, state, and local law enforcement agencies in relation to locating and apprehending, and, where appropriate, removing criminal aliens helps to fight transnational gangs.  AR01451-52, AR01514-15.

30. The Department of Justice believes that individuals who are in criminal custody are more likely to commit crimes in the future than the population at large.  AR00119, AR00155, AR00499, AR00506.

31. Criminal aliens are less likely to re-offend if they are removed from the country than if they are released into communities in the United States.  AR00047-48, AR00226.

32. On February 24, 2018, Mayor Libby Schaaf of Oakland, California, publicly disclosed on Twitter and Facebook a planned future operation of the U.S.

Immigration and Customs Enforcement (ICE) in the Bay Area.  AR01038-39.

33. It is generally safer for federal immigration agents to take a person into custody within the controlled confines of a jail or other correctional institution than in an uncontrolled setting, such as on a public street or in a private home.  *See* Decl. of Caridad Cephas-Kimbrough, U.S. Immigration and Customs Enforcement ("Cephas-Kimbrough Dec."), ¶ 8 (attached as Exhibit 2).

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.      The Immigration and Nationality Act

Enforcement of the immigration laws, especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function.  Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and other Executive agencies to administer and enforce the immigration laws.  The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives.  *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens.  For example, the INA provides that aliens who have committed certain classes of crimes – whether

federal, state, or local – shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security.  *See*, *e.g.*, 8 U.S.C. § 1227(a)(2).  A specific statute provides that every twelve months, the Attorney General must report to the House and Senate judiciary committees on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies" – "stating the number incarcerated for each type of offense."  *Id.* § 1366(1), (2).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration.  For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address.  *Id.* §§ 1306(a), (b).  More seriously, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."  *Id.* § 1324(a)(1)(A)(iii).  It also imposes penalties for "engag[ing] in any conspiracy to commit any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts."  *Id.* § 1324(a)(1)(A)(v).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement.  For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id.* § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id.* § 1252c; *see id.* § 1357(g) (authorizing formal

13

cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens).  Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities.  Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  Section 1644 of Title 8 contains substantially the same proscription.  Section 1373 also provides that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity."  By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA.  *Id.* § 1252c(b).

## II.  DOJ's Office of Justice Programs and the Byrne JAG Program

Title I of the Omnibus Crime Control and Safe Streets Act of 1968, which was enacted expressly to promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government," Pub. L. No. 90-351, 82 Stat. 197, 197, established the Office of Justice Programs ("OJP"), headed by an Assistant Attorney General ("AAG").  *See* Pub. L. No. 90-351, 82 Stat. 197 (1968), *codified as amended at* 34 U.S.C. § 10101 *et seq.*  The same title of the Omnibus Crime Control Act

also established an early iteration of what is now known as the Edward Byrne Memorial

Justice Assistance Grant ("Byrne JAG") Program.  *See generally* 34 U.S.C. §§ 10151-58.

Under this Program – which came into its modern form through the Violence against

Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162,

119 Stat. 2960 (2006) (the "Reauthorization Act") – OJP is authorized to "make grants to

States and units of local government . . . to provide additional personnel, equipment

. . . and information systems for criminal justice, including for any one or more of [certain

enumerated] programs." 34 U.S.C. § 10152(a)(1).  In the same chapter, "criminal justice"

is defined broadly to include various activities of the police, the courts, and "related

agencies" that "pertain[] to crime prevention, control, or reduction."  *Id.* § 10251(a)(1).

The Byrne JAG Program provides "formula grants," that is, grants that – when

awarded – follow a statutory formula for the dollar amount of the grant based on

population, the rate of violent crime, and other factors. *Id.* §§ 10152(a)(1), 10156.  For

Fiscal Year ("FY") 2017, Congress appropriated $396,000,000 for the Byrne JAG

Program, with certain riders that made carve-outs for specific initiatives. *See* Consoli-

dated Appropriations Act, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203 (2017).

Despite the term "formula grants," the Department retains significant authority by statute

to serve as the gatekeeper for the award of grants.  By statute, the "Attorney General

*shall* issue rules to carry out" the Byrne JAG Program.[3]  34 U.S.C. § 10155 (emphasis

---

[3] Although such "rules" in large part are issued through annual Byrne JAG Program solicitations and award documents, they also have been promulgated by DOJ through such notice-and-comment regulations as 2 C.F.R. § 2800.101 (adopting and supplementing 2 C.F.R. part 200 (the Office of Management and Budget's Executive-Branch-wide "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards").  Among the "rules" thus adopted are 2 C.F.R. §

added). Again, by statute, a prospective grantee must submit an application "in such form as the Attorney General may require," 34 U.S.C. § 10153(A); and the application must include, among other things, "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," *id.* § 10153(A)(5)(D), "[a]n assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(A)(4), and "[a] certification, made in a form acceptable to the Attorney General . . . that . . . there has been appropriate coordination with affected agencies." *Id.* § 10153(a)(5)(C).

### III. Congressional Action and the Multi-Year History of Special Conditions in the Byrne JAG Program.

Congress has charged OJP with the duty to promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government," Pub. L. No. 90-351, 82 Stat. at 197. To accomplish this statutory duty, and with the authority provided by 34 U.S.C. § 10102(a)(6), amongst other statutes, OJP has historically included a variety of special conditions, which have varied

---

200.300 ("Statutory and national policy requirements"), which provides that each "Federal awarding agency *must* manage and administer the Federal award in a manner so as to ensure that Federal Funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements" (emphases added) and 2 C.F.R. § 200.210(b)(1)(ii) (generally defining "National policy requirements" to "include statutory, executive order, other Presidential directive, or regulatory requirements"). *See also* 34 U.S.C. § 10221(a) (authorizing OJP, "after appropriate consultation with representatives of States and units of local government, to establish such rules, regulations, and procedures as are necessary to the exercise of their functions, and as are consistent with the stated purposes of [title I of the Omnibus Crime Control and Safe Streets Act of 1968, generally codified as amended at 34 U.S.C. §§ 10101-10726]").

according to national law enforcement necessities and DOJ priorities, in Byrne JAG award documents.

Before 2006, the statute provided, without elaboration, that the AAG for OJP had the power to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General." 42 U.S.C. § 3712(a)(6) (2000). Of particular relevance, in the same Reauthorization Act that gave the Byrne JAG Program into its modern form, Congress amended the statute again, to allow the responsible AAG to: "'plac[e] *special conditions* on all grants, and determin[e] *priority purposes* for formula grants.'" Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6) (emphasis added).

Since 2006, OJP has included special conditions in *every* Byrne JAG award document to the State of Colorado. These conditions are extensively set forth in pages prominently with the capitalized and italicized heading of "*SPECIAL CONDITIONS.*" *See, e.g.* Ex. 1(A) (FY 2006 Byrne JAG award to Colorado); Ex. 1(K) (FY 2016 Byrne JAG award to Colorado). In FY 2006, Colorado's award contained 19 special conditions of various types. *See* Ex. 1(A). The number of special conditions would grow over the years as new law enforcement priorities were identified, and as differing political priorities of each Administration were pursued. For example, during the last Administration, the FY 2016 award to Colorado contained 52 special conditions. *See* Ex. 1(K). This included controversial conditions, such as Special Condition 45, which, in exchange for accepting and using Byrne JAG grant monies, required law enforcement agencies to adopt "robust and specific" policies on "Community Policing" and "Constitutional Policing" when agencies purchased certain equipment. *See* Ex. 1(K), ¶

45.[4]  During this same year, the prior Administration also first recognized that 8 U.S.C. § 1373 was an "applicable" federal law requiring compliance from grantees.  *See* AR-00384 (July 7, 2016 OJP Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program).  Thus, controversial conditions in the Byrne JAG program are not new.  And during the 13 years from FY 2006 to FY 2016, Colorado accepted all special conditions each year without complaint.

Today, the FY 2018 Byrne JAG award to Colorado contains 63 special conditions, covering a wide variety of areas.  Examples include:

- Special Condition 9 – requiring procedures to report data breaches.  *See* Am. Compl., Ex. 1 (ECF No. 13-1), ¶ 9.

- Special Condition 12 – prohibiting certain conduct that could support improper human trafficking and requiring reporting of such allegations. *See id.* at ¶ 12.

- Special Conditions 18-20 – requiring compliance with civil rights and nondiscrimination regulations promulgated by the Department of Justice. *See id.* at ¶¶ 18-20.

- Special Condition 26 – encouraging grantees to prohibit their employees from sending text messages while driving.  *See id.* at ¶ 26.

- Special Condition 35 – requiring grantees that conduct research on human subjects to comply with policies and precautions issues by the Department and OJP.  *See id.* at ¶ 35.

- Special Condition 38 – requiring high-ranking members of each law enforcement task force that receives funds to complete certain OJP-approved training.  *See id.* at ¶ 38.

- Special Conditions 40 and 59 – requiring grantees to upload the results of certain firearm background checks into the National Instant Background

---

[4] This particular condition was added in response to Presidential Executive Order 13688, but the content of "Community Policing" and "Constitutional Policing" proved to be so controversial that the Executive Order was rescinded soon after the change of administrations.  *See* Exec. Order No. 13809, 82 Fed. Reg. 41,499 (Aug. 28, 2017).

Check System (NICS) and the results of certain DNA tests into the FBI's Combined DNA Index System (CODIS).  *See id.* at ¶¶ 40, 59.

All of these conditions are authorized by Section 10102(a)(6), among other authorities, and are unchallenged by the Plaintiff.

Finally, to understand the history of the Byrne JAG program, it is important to examine Congress' yearly actions that support the program.  As described above, in 2006, Congress provided express authority for the AAG to place "special conditions on *all* grants."  34 U.S.C. § 10102(a)(6) (emphasis added).  Further, in the same Act, Congress authorized the AAG to "determin[e] priority purposes for *formula* grants."  *Id.* (emphasis added).  This was not just hollow wording.  Instead, the legislative history clearly indicates that Congress intended to expand the AAG's express authority, explaining that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Congress did not stop there in 2006, however.  During each successive year, Congress voted to appropriate money to the Byrne JAG program.  *See, e.g.,* Consolidated Appropriations Act, Pub. L. No. 111-117, Div. B, Title II, 123 Stat. 3034, 3133 (2010); Consolidated Appropriations Act, Pub. L. No. 114-113, Div. B, Title II, 129 Stat. 2242, 2306 (2016); Consolidated Appropriations Act, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203 (2017).  During the following 13 years, Congress was well-aware of OJP's use of special conditions and the way in which the Byrne JAG program was administered.  And during any of those 13 years, Congress could have repealed Section 10102(a)(6) or acted in other ways prohibit certain conditions.  But Congress did not.  Instead, Congress voted each year to fund the Byrne JAG program.  That

19

includes funding for FY 2018, which contain the conditions challenged by the Plaintiff.

*See* Consolidated Appropriations Act, Pub. L. No. 115-141, Div. B, Title II, 132 Stat.

348, 420 (2018).

### IV.   The Conditions Challenged in this Litigation

For the current Byrne JAG grant cycle, Fiscal Year 2018, OJP notified potential

applicants that awards would include certain conditions requiring modest cooperation with

federal law enforcement responsibilities in the immigration setting.  Those conditions

require Byrne JAG recipients, within the "program or activity" funded by the award:

- To provide a certification that "neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the 'program or activity' to be funded in whole or in part under the FY 2018 OJP Program . . . , and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b)." *See* Am. Compl., Ex. 1 (ECF No. 13-1), ¶ 41; https://ojp.gov/funding/Explore/pdf/FY18JAG_STATE_13731644_Rev0816.pdf (text of certification).

- To monitor funded programs and any sub-grantees' funded programs for restrictions that prohibit any governmental entity or official from sending or receiving information regarding citizenship or immigration status to the federal law enforcement.  *See id.*, ¶ 42.

- To refrain from obligating award funds to a program or activity of the recipient or sub-grantee that is subject to certain restrictions on the communication of immigration information to federal authorities.  *See id.*, ¶ 43.

- Consistent with the objectives of federal law enforcement statutes – including 8 U.S.C. § 1324(a) and 18 U.S.C. § 1071 – not to allow public disclosure of any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law, regardless of whether the disclosure would violate 8 U.S.C. § 1324(a) (the "public-disclosure condition").  *See id.*, ¶ 44.

- Consistent with federal law enforcement statutes and regulations – including 8 U.S.C. § 1357(a)(1) and 8 C.F.R. § 287.5(a)(1) – to allow access of immigration officials to correctional facilities funded by Byrne JAG grants to meet with an alien (the "access condition").  *See id.*, ¶ 45.

- Consistent with federal law enforcement statutes – including 8 U.S.C. §§ 1231(a) and 1226(c)(1) – to notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials, if that custody occurs as part of a program funded by Byrne JAG grants (the "notice condition").  *See id.*, ¶ 46.[5]

Finally, it is important to understand the limited scope of these challenged conditions.  These conditions do *not* apply at all times to all parts of the Colorado state government.  Similarly, these conditions do *not* apply at all times to all parts of any sub-grantee.  Instead, these challenged conditions apply more narrowly, only to the funded "program or activity" that receives federal financial assistance under the Byrne JAG award.  *See, e.g.*, *id.*, ¶ 41 ("within the funded 'program or activity'"); ¶¶ 42-46 (same).  This term of art is defined to have the same meaning as in the 1964 Civil Rights Act, 42 U.S.C. § 2000d-4a.  *See, e.g.,* Am. Compl., Ex. 1 (ECF No. 13-1), ¶ 42(5)(A)(3) (defining "Program or activity" by reference to the 1964 Civil Rights Act).  Thus, "program or activity" narrows the scope of the challenged conditions.

---

[5] Under the "Rules of Construction" within those grant conditions, the FY 2018 award documents make clear that nothing in the FY 2018 notice condition requires a Byrne JAG grantee to detain "any individual in custody beyond the date and time the individual otherwise would have been released."  *See* Am. Compl., Ex. 1 (ECF No. 13-1), ¶ 46(4)(B).  The documents also make clear that this condition imposes no requirements in relation to any requests from federal immigration authorities to detain non-citizens, and that the condition requires "only as much advance notice as practicable" before the release of an alien.  *Id.*

**ARGUMENT**

I.    **The Challenged Immigration Conditions in the Byrne JAG Program Do Not Violate the Separation of Powers.**

Count I of the Amended Complaint alleges that the challenged immigration

conditions violate the Constitution's separation of powers.  *See* Am. Compl. ¶¶ 62-71.

Plaintiff's claims rest on the flawed premise that Congress has not authorized DOJ to

impose these conditions on the receipt of Byrne JAG funds; as shown below, however,

Congress has done precisely that.

As a preliminary matter, plaintiff does not dispute that Congress may, consistent

with the separation of powers, properly delegate to the Executive Branch the authority

to attach conditions to agency spending.  *See*, *e.g.*, *Clinton v. City of N.Y.*, 524 U.S.

417, 488 (1998) ("Congress has frequently delegated the President the authority to

spend, or not to spend, particular sums of money.") (Breyer, J. dissenting) (citing

examples dating back to the founding of the Republic); *City of Los Angeles*, No. 18-

55599, Slip. Op at 18 n.6  ("Spending Clause . . . principles . . . apply to agency-drawn

conditions on grants to states and localities just as they do to conditions Congress

directly places on grants" whether "Congress ha[s] written the challenged conditions

directly into the statutes authorizing the grants" or where "Congress [has] delegated the

task of specifying these conditions to DOJ"); *DKT Mem'l Fund Ltd.*, 887 F.2d 275 at

280-81 (upholding conditions on spending imposed by President where statute

authorized President to set certain "terms and conditions as he may determine");

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986)

("Congress appropriates funds for a wide variety of purposes and delegates to

executive branch officials the authority to make certain decisions regarding how those

funds are to be spent."). Accordingly, the plaintiff's emphasis on the fact that Congress did not itself *directly* impose any immigration enforcement conditions on the receipt of Byrne JAG funds (*see* Am. Compl., ¶ 67), is wholly beside the point. Rather, the sole relevant question is whether Congress has *delegated* sufficient authority to DOJ to impose these conditions, in order to promote inter-governmental law enforcement cooperation.

An examination of the relevant statutory framework for the Byrne JAG program makes clear that Congress did delegate such authority, in no uncertain terms.

### A. The Conditions are Authorized by 34 U.S.C. § 10102(a)(6).

As noted above, the contemporary version of the Byrne JAG Program was created in 2006, when the Reauthorization Act merged two earlier programs. *See* Pub. L. No. 109-162, 119 Stat. 2960. Prior to the 2006 amendments, the relevant statute provided only that the AAG for OJP was authorized to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the [AG]." *See* 42 U.S.C. § 3712(a)(6) (West 2005). In the Reauthorization Act, Congress expressly amended this provision by inserting, "'including placing special conditions on all grants, and determining priority purposes for formula grants'" before the period at the end. Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6). And confirming this amendment's plain text, a report accompanying the Act explained that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

This context confirms that Congress intended the "special conditions" and "priority purposes" language to confer distinctive and meaningful power on the AAG to impose grant conditions.  And yet, the plaintiff's attack on the AAG's authority to issue special conditions gives no practical effect to *either* the "special condition" *or* the "priority purpose" powers—and directly contravenes the "well-known canon of statutory construction that, in general, a statute should not be construed so as to render a word or clause inoperative."  *Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000); *see also*, *e.g.*, *Johnson v. Consumerinfo.com*, *Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." (citation omitted)).

Further, in keeping with the canon against surplusage, the language of Section 10102(a)(6) should be read to convey *independent* authority for the AAG to "determin[e] priority purposes for formula grants."  Congress's express formulation here plainly indicates an intention to allow the AAG to exercise a degree of discretion over *formula* grants in particular.[6]  This discretion must, if this language is to be afforded any

---

[6] Similar delegations of discretionary authority over the terms and conditions of federal grants are commonplace. *See*, *e.g.*, Federal Financial Assistance Management Improvement Act of 1999, Pub. L. No. 106-107, 113 Stat.1486-1490 (expressly authorizing OMB to "direct, coordinate, and assist Federal agencies" in establishing "a Government-wide uniform rule for any generally applicable requirement established to achieve national policy objectives that applies to multiple Federal financial assistance programs across Federal agencies"); 42 U.S.C. § 713(a)(1)(C)(i) (providing for U.S. Department of Health & Human Services ("HHS") grants for personal responsibility education, to be paid upon satisfaction of certain statutory requirements *and* "such additional requirements as the [HHS] Secretary may specify"); *id.* § 1395l(t)(2)(E) (providing that HHS Secretary may make certain adjustments to Medicare spending as well as "other adjustments as determined to be necessary to ensure equitable payments"); 25 U.S.C. § 1644(b) (authorizing Secretary of Interior to "place conditions as deemed necessary to effect the purpose of this section in any grant or contract which

meaningful legal effect, encompass at least the minimal authority to: (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) impose eligibility conditions reflecting the priority purpose.  In other words, under a plain reading of the statute, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*.  *See also* 2 C.F.R. § 200.300 ("Statutory and national policy requirements":  each "Federal awarding agency *must* manage and administer the Federal award in a manner so as to ensure that Federal Funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements" (emphases added)).  Further, because states and localities can decline to participate in the Byrne JAG Program – and thus, effectively annul any conditions attached to the grants – were this authority invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 579 (2012) ("Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds.  In the typical case we look to the States to defend their prerogatives by adopting the simple expedient of not yielding to federal blandishments when they do not want to embrace the federal policies as their own.  The States are separate and

---

the Secretary makes with any Indian tribe or tribal organization pursuant to this section.").

independent sovereigns.  Sometimes they have to act like it." (internal citation and quotation marks omitted)).

The immigration conditions at issue here – which merely promote inter-governmental law enforcement cooperation with respect to criminal aliens, so that grantee policies do not impair important federal policies – come comfortably within the powers delegated in Section 10102(a)(6).  Pursuant to this authority (among others), the AAG may condition the award of formula grants, like the Byrne JAG Program, on state and local cooperation with federal authorities in achieving federal law enforcement priorities, including the removal of criminal aliens.

### B.  The Conditions are Authorized by 34 U.S.C. § 10153.

Independent of the authority conferred in Section 10102(a)(6), a separate source of authority further supports the challenged conditions.  The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes.  34 U.S.C. § 10152(a)(1).  Among other requirements set out specifically in the Byrne JAG statute, applicants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals.  For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies."  *Id.* § 10153(A)(4), (5)(C).

The propriety of the notice and access special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to "reasonably

26

require" "programmatic" information about the funded program, 34 U.S.C.

§ 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.*

§ 10153(A)(5)(C).  Notice of an alien's release from local custody constitutes

reasonable information about the law-enforcement and corrections programs funded by

the grants.  And access to an alien in local custody constitutes appropriate coordination

with federal immigration authorities affected by those programs' custody over the alien.

Further, section 10153 provides additional statutory authority for the challenged

conditions.  Underscoring the Byrne JAG Program's emphasis on intergovernmental

cooperation so that grantee policies do not impair federal policies, Byrne JAG grantees

must "comply with . . . all other applicable Federal laws."  34 U.S.C. § 10153(A)(5)(D).

In the context of the Byrne JAG statute, the phrase "applicable Federal laws" covers

laws that apply to Byrne JAG applicants and are constitutionally applied as grant

conditions.

## II.  The Challenged Immigration Conditions Do Not Violate the Spending Clause.

Count II of the Amended Complaint alleges that the challenged conditions violate

the Spending Clause.  *See* Am. Compl. ¶¶ 72-75.  The Spending Clause provides that

Congress has the power "to pay the Debts and provide for the common Defence and

general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  This power gives

Congress the ability "to grant federal funds to the States, and [Congress] may condition

such a grant upon the States' 'taking certain actions that Congress could not require

them to take.'"  *NFIB*, 567 U.S. at 576 (quoting *Coll. Sav. Bank. v. Fla. Prepaid*

*Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)).  It is well-established

that the Spending Clause authority is "broad," and empowers Congress to "set the

terms on which it disburses federal money to the States[.]"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also*, *e.g.*, *Dole*, 483 U.S. at 206 (noting that Congress has "repeatedly employed the [spending] power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.") (citations omitted); *see also Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (the Spending Clause is a "'permissible method of encouraging a State to conform to federal policy choices,' because 'the ultimate decision' of whether to conform is retained by the States – wh[ich] can always decline the federal grant.") (quoting *New York*, 505 U.S. at 168)).

In this case, the plaintiff alleges that the conditions are insufficiently related to the statutory purposes of the Byrne JAG Program and are impermissibly ambiguous.  *See* Am. Compl., ¶ 74.  Both contentions are wrong.

## A. The Conditions are Sufficiently Related to the Purposes of the Byrne JAG Program.

First, any "relatedness" inquiry required by the Spending Clause does not pose a difficult hurdle.  To the contrary, this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for relatedness." *Mayweathers*, 314 F.3d at 1067.  "Congress's power under the Spending Clause is broad" and it is "well settled that Congress is entitled to further policy goals indirectly through its spending power that it might not be able to achieve by direct regulation." *Alliance for Open Society Intern., Inc. v. U.S. Agency for Intern. Development*, 651 F.3d 218, 230 (2d Cir. 2011).  Thus, in *South Dakota v. Dole*, the Supreme Court upheld conditioning the receipt of federal highway funds on the loosely-related requirement that a State adopt a minimum drinking age.  *See* 483 U.S. at 208-09; *see also New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only

28

"some relationship" is necessary between spending conditions and "the purpose of the federal spending."); *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (explaining that there need only be a "discernible relationship" between a condition imposed pursuant to the Spending Clause and the "federal interest in a program it funds").  As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds."  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry.  *Mayweathers*, 314 F.3d at 1067.  The Byrne JAG Program's organic statute specifies that program funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "disseminat[ing] information" and "*maintain[ing] liaison with . . .*  State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(1), (2) (emphasis added).  And because the grant conditions at issue here go no further than the "program or activity" receiving assistance under the Byrne JAG award, they are tailored to avoid "unrelated" aspects of a grantees operations.  *See Koslow*, 302 F.3d at 176 (observing that the challenged condition "govern[ed] only a 'program or activity' receiving federal funds," and noting that this limitation aided in satisfying "the 'relatedness' requirement articulated in *Dole*").

Despite this, the plaintiff's Amended Complaint focuses on the purportedly local nature of criminal law enforcement and the proposition that immigration enforcement is civil in nature but ignores the fact that the INA is designed to allow local criminal

enforcement before passing the baton to federal immigration enforcement.  *See* Am. Compl., ¶ 74 ("In particular, the immigration-related objectives reflected in the Special Conditions are unrelated to the functions of local law enforcement and instead concern federal immigration enforcement.").  As an initial matter, the Ninth Circuit recently concluded that DOJ's determination that illegal immigration enforcement is a public safety issue was reasonable despite immigration enforcement being a predominantly civil matter.  *See City of Los Angeles*, No. 18-55599, Slip. Op at 23.  According to the Ninth Circuit:

> . . . DOJ's understanding that illegal immigration presents a public safety issues has been acknowledged by the Supreme Court.  *See Arizona v. United States*, 567 U.S. 387, 397-98 (2012).  While "it is not a crime for a removable alien to remain present in the United States," *id.* at 407, the Court has recognized that in some jurisdictions, such as Arizona's "most populous county," aliens who have entered the country illegally "are reported to be responsible for a disproportionate share of serious crime," *id.* at 397-98. The Court has noted that "[a]ccounts in the record suggest there is an 'epidemic of crime, safety risks, serious property damage, and environmental problems' associated with the influx of illegal migration across private land near the Mexican border." *Id.* at 398.  Congress has likewise expressed concern about "increasing rates of criminal activity by aliens." *Demore v. Kim*, 538 U.S. 510, 518 (2003).

*City of Los Angeles*, No. 18-55599, Slip. Op at 23.  Based upon this, the Ninth Circuit squarely rejected Los Angeles's spending clause challenge to similar conditions on grant programming, noting that "cooperation relating to enforcement of federal immigration law is in pursuit of the general welfare, meets the low bar of being germane to the federal interest in providing the funding to address crime and disorder problems and otherwise . . . enhance public safety." *Id.* at 19 (internal quotation marks and citation omitted).

The same is true of the Byrne JAG program.  Here, the term "criminal justice" is defined in the statute – and defined very broadly.  *See* 34 U.S.C. § 10251(a)(1).  There,

Congress defined it to mean more than simply prosecuting individuals for violations of criminal law.  Rather, it includes "activities *pertaining* to crime prevention, control, or reduction" in addition to the mere "enforcement of the criminal law."  *Id.* (emphasis added).  Thus, ensuring that grantees do not publicly disclose sensitive federal law enforcement information to shield dangerous individuals from detection obviously fits within this broad definition.  Similarly, identifying and removing deportable criminal aliens promotes crime prevention.  Once removed, a criminal alien who has committed a removable offense—for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

This is particularly true given high recidivism rates, indicating that it is likely that a criminal alien not removed will again engage in criminal activity.  *See* Marial Alper, Mathew R. Durose, & Joshua Markman, *2018 Update on Prisoner Recidivism: A 9-Year Follow-UP Period (2005-2014)*, Bureau of Justice Statistics (May 23, 2018), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6266.  Moreover, ensuring that immigration enforcement efforts are not in conflict with the activities of local criminal law enforcement is an essential component of proper management of dual law enforcement entities.  *Cf. California v. Sessions*, 284 F. Supp. 3d 1015, 1033 (N.D. Cal. 2018) (noting that "criminal law impacts the INA in a variety of ways" and that "the relationship the government needs to add conditions to the receipt of grants does not need to be close").  Thus, preventing the disclosure of federal law enforcement information that is shared to ensure the safety and avoid conflicts between the operations of two authorized law enforcement agencies is necessarily related to the criminal-justice

purposes of the Byrne JAG Program.  The challenged conditions fall squarely within the statutory definition of "criminal justice," even if immigration enforcement itself is generally considered to be civil in nature.

Further, as noted above, immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, including the removal of previously-convicted offenders.  *See* 8 U.S.C. § 1227(a)(2). Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  *Duvall v. Att'y Gen. of the U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted).

As explained above, the INA repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement, particularly with respect to criminal aliens.  Furthermore, given that the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities do not impair the law enforcement activities of the federal government with respect to the same population—namely, aliens who have committed crimes.  Congress has mandated that aliens who have committed certain criminal offenses be taken into federal custody pending removal proceedings "when the alien is released" from state custody.  *Id.* § 1226(c)(1).  *See also Jennings v. Rodriguez*, 138 S. Ct. 830, 837-38 (2018) ("Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under § 1226(a). Under § 1226(c), the

Attorney General shall take into custody any alien who falls into one of several

enumerated categories involving criminal offenses and terrorist activities." (internal

quotation marks omitted)).  With respect to incarcerated aliens subject to a final removal

order, the INA establishes a "removal period" of 90 days that begins with the date of the

alien's release.  8 U.S.C. § 1231(a)(1)(A), (B).  It is important to this cooperative law

enforcement/criminal justice framework that states and localities respond to requests for

release date information, give federal agents access to detainees in their custody, and

avoid restricting communication of information regarding immigration status to DHS.

### B.  The Conditions are Clear and Unambiguous.

Under the Spending Clause analysis, when the federal government "desires to

condition the States' receipt of federal funds, it must do so unambiguously . . . ,

enable[ing] the States to exercise their choice knowingly, cognizant of the

consequences of their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  Despite

the plaintiff's challenge to the contrary (*see* Am. Compl., ¶ 74), the challenged

immigration conditions satisfy this requirement.

In considerable detail, these conditions clearly state what conduct is required, so

that grantees can "exercise their choice knowingly, cognizant of the consequences of

their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  They require grantees (1)

to give agents of the United States acting under color of federal law access to certain

correctional facilities to meet with individuals who are (or are believed by such agents to

be) aliens and to inquire as to such individuals' right to be or remain in the United

States, (2) to notify DHS, upon formal written request and as early as practicable,

before the scheduled release date and time for a particular alien in certain facilities, and

(3) to refrain from restricting the communications of certain government officials or employees to federal authorities regarding immigration information.  *See* Am. Compl., Ex. 1 (ECF No. 13-1), ¶¶ 41-46 (setting forth the conditions in the FY 2018 Byrne JAG award to plaintiff).  The award documents also specify that nothing in these conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition;" that the conditions impose no requirements regarding any requests by federal immigration authorities to detain aliens; and that the notice condition requires "only as much advance notice as practicable."  *Id.* at ¶ 46(4)(B).  Moreover, to the extent any uncertainty might remain, the FY 2018 Byrne JAG award letter invited any prospective grantee with a question about any requirement of the solicitation to contact OJP's Program Manager.  *See* Ex. at 1.

Further, any arguable marginal uncertainty regarding the outer boundaries of the grant conditions would not render these conditions unconstitutionally ambiguous. Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see*, *e.g.*, *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper.") (citation omitted).  The problem in this case is not that DOJ has failed to provide plaintiff with notice of the modest immigration conditions attached to Byrne JAG grants, thus allowing plaintiff to knowingly

refuse them.  Instead it is that, having received clear notice, plaintiff seeks to take the money while ignoring the conditions on which it is offered.  Neither the Spending Clause nor its interpreting jurisprudence, however, gives plaintiff this option to have it both ways.

**III.    The Challenged Immigration Conditions are Reasonable and Do Not Violate the Administrative Procedure Act.**

Counts III through V of the Amended Complaint allege that the immigration conditions violate the APA.  *See* Am. Compl., ¶¶ 76-96.  Specifically, the plaintiff alleges that DOJ's promulgation of the challenged conditions was *ultra vires* and without statutory authority (*id.* at ¶ 79), that the promulgation violated 34 U.S.C. § 10228 (*see* Am. Compl., ¶ 86), and that the promulgation was arbitrary and capricious.  *Id.* at ¶ 90.  None of these contentions survive scrutiny.

**A.  The Challenged Conditions are Not *Ultra Vires*.**

In Count III of the Amended Complaint, plaintiff alleges that the defendants lacked statutory authority to issue the conditions, rendering such conditions as *ultra vires,* thereby violating the APA.  *See id.* at ¶ 79.  But as demonstrated above, the defendants have ample, broad authority to issue the challenged conditions, under either 34 U.S.C. § 10102(a)(6) or under 34 U.S.C. § 10153.  For these same reasons, the conditions are not *ultra vires*, and Count III must be dismissed.

**B.  The Conditions Do Not Violate 34 U.S.C. § 10228(a).**

In Count IV of the Amended Complaint, plaintiff claims that the challenged conditions impermissibly exercise direction, supervision, or control over the plaintiff's police forces, which supposedly violates 34 U.S.C. § 10228(a), and in turn, supposedly violates the APA.  *See* Am. Compl., ¶ 86.  This claim fails as a matter of law.

As an initial matter, the Ninth Circuit recently considered and rejected a similar argument regarding notice and access conditions in another federal grant program.  In *City of Los Angeles*, Los Angeles challenged the Department's use of similar access and notice conditions as factors to award funds to jurisdictions under the Community Oriented Policing Services ("COPS") grant program.  *Id.* at Slip. Op. 25.  The Ninth Circuit rejected Los Angeles's argument that Section 10228(a) prohibited such conditions, noting that "DOJ's scoring process does not coerce an applicant or authorize the federal government to exercise any control over state or local law enforcement."  *Id.* at 19 n. 7.

Moreover, the challenged conditions do not impermissibly control local law enforcement.  As the Fourth Circuit has explained, "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies," avoiding "the establishment of a federal police force" by allowing federal authority to control the "routine operations of a local police force," such as by "prescribing the type of shoes and uniforms to be worn" or "the type or brand of ammunition to be purchased."  *Ely v. Velde*, 451 F.2d 1130, 1136-37 (4th Cir. 1971). The challenged conditions do no such thing.  Ensuring that state and local governments do not undermine federal law enforcement as a condition of the receipt of federal funds does not remotely implicate these concerns. Indeed, plaintiff's challenge on this point would appear to call into question any funding condition imposed by DOJ on a State or local law enforcement entity, including those that have been imposed, unchallenged, for many years.

36

### C.  The Challenged Conditions are Reasonable.

In Count V, plaintiff claims that the conditions are arbitrary and capricious,

thereby violating the APA.  *See* Am. Compl., ¶ 90.  But, as shown below, the conditions

are imminently reasonable and within the broad discretion of the defendants to

promulgate.  As such, Count V must be dismissed.

As an initial matter, the Ninth Circuit's recent decision in *City of Los Angeles*

considered and rejected a similar APA challenge to the defendants' determination that

the enforcement of federal immigration law is reasonably and rationally related to

advancing criminal justice and public safety goals in a federal grant program.  *See City*

*of Los Angeles*, No. 18-55599, Slip. Op at 31.  There, Los Angeles argued the

defendant's determination was unreasonable in light of contradictory evidence that the

city's sanctuary policies were more effective at policing crime.  *See id.* at 31-32.  The

Ninth Circuit rejected this argument, holding that the defendants' determination was

rational, reasonable, and well within the bounds of discretion: "The public safety issues

that arise from illegal immigration can be addressed through collaborative interactions

and information flow between law enforcement and the community, just as with any

other sort of public safety issue, such as those arising from 'violent crime problems' and

other focus area."  *See id.* at 23-24.  The Ninth Circuit recognized that Los Angeles had

a legitimate policy dispute with the defendants, but this did not authorize the court to

substitute its judgment about wise policy in place of the defendants' judgment:  "Los

Angeles may believe that addressing illegal immigration is not the most effective way to

improve public safety, but the wisdom of DOJ's policy is not an element of our arbitrary

and capricious review.  We may not substitute [our] judgment for that of the agency."

*See id.* at 32 (internal quotation marks and citations omitted).  The same result should be reached in this case.

Moreover, if the conditions are statutorily authorized and comport with the Spending Clause, it is unclear how "arbitrary or capricious" scrutiny could otherwise limit DOJ's broad discretion.  In any event, when a court reviews an agency's action under the "arbitrary or capricious" standard, it is "required to be 'highly deferential,'" and to "presum[e] the agency action to be valid" as long as it is supported by a rational basis. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)). This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

The challenged conditions easily satisfy this deferential standard. The Byrne JAG Program's authorizing statute specifies that Byrne JAG funds are designed to provide resources for, *inter alia*, "criminal justice."  34 U.S.C. § 10152(a)(1).  As explained above, this statutorily-defined term is broad, including "activities pertaining to *crime prevention, control, or reduction*, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts having criminal jurisdiction, and *related agencies*," *id*. § 10251(a)(1) (emphases added).

Such purposes are rationally advanced by facilitating federal access to aliens who have violated, or are suspected of violating, state or local criminal laws—if for no other reason than that once removed, an alien who has committed a removable criminal

offense is undeniably no longer present in this country with the potential to re-offend. *See* 8 U.S.C. § 1227(a)(2) (providing that a criminal conviction for any of a wide array of criminal offenses renders an alien removable).  These purposes are also advanced by requiring grantees to safeguard the confidentiality of sensitive, tactical law enforcement information.[7]

Further, the challenged conditions are consonant with the Byrne JAG Program's purposes of ensuring that grantees "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5). Moreover, the challenged conditions promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government," Pub. L. No. 90-351, 82 Stat. at 197, and rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the inter-governmental cooperation that Congress contemplates in immigration enforcement.  Indeed, the imposition of the challenged conditions is understandable as a result of a pair of investigations conducted by the Department's Office of Inspector General ("OIG").

In 2007, the OIG conducted a congressionally-mandated audit concerning the cooperation of State Criminal Alien Assistance Program ("SCAAP") recipient

---

[7] Indeed, the public-disclosure condition protects some of the same information covered by the law enforcement exemption to the federal Freedom of Information Act, which exempts from disclosure, among other things, information compiled for law enforcement purposes whose disclosure "could reasonably be expected to interfere with enforcement proceedings" or to "endanger the life or physical safety of any individual." 5 U.S.C. § 552 (b)(7)

jurisdictions in the removal of criminal aliens from the United States.  *See* AR-00001-

00109 (Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the

United States ("2007 OIG Audit")).  In conducting this audit, the OIG "interviewed ICE

officials to obtain their views, distributed a questionnaire to 164 SCAAP recipients, and

conducted independent testing in 7 jurisdictions that received SCAAP funding" under 8

U.S.C. § 1231(i).  *Id.* at AR-00005.  Relevant to compliance with 8 U.S.C. § 1373, the

audit reported that, as of that time, "[t]he 99 jurisdictions that responded to the

questionnaire stated almost unanimously that there was no legislation or policy

impeding the ability of local officers and agencies to communicate with ICE on

immigration-enforcement matters."  *Id.* at AR-00011.  The 2007 OIG Audit observed

broadly that "many state, county, and local law enforcement agencies are unwilling to

initiate immigration enforcement but have policies that suggest they are willing to

cooperate with ICE when they arrest individuals on state or local charges and learn that

those individuals may be criminal aliens."  *Id.* at AR-00040-41.

Nine years later, the OIG issued a report in response to a request by OJP to

examine allegations of potential violations of Section 1373 by grant recipients.  *See*

2016 OIG Report at AR-00366.  This 2016 review found deteriorating local cooperation

with "efforts to remove undocumented criminal aliens from the United States."  *Id.* at

AR-00366-67 n.1.  The 2016 OIG Report advised that "the information we have learned

. . . during our recent work  . . . differs significantly from what OIG personnel found

nearly 10 years ago" when federal immigration authorities had "commented favorably to

the OIG with respect to cooperation and information flow they received from the seven

selected jurisdictions, except for [one jurisdiction]" that were examined.  *Id.*  The 2016

40

OIG Report found that "each of the 10 jurisdictions" surveyed "had laws or policies directly related to how those jurisdictions could respond to ICE detainers, and each limited in some way the authority of the jurisdiction to take action with regard to ICE detainers." *Id.* at AR-00369.  Examining various jurisdictions' policies, the OIG stated that, "based on our discussions with ICE officials about the impact these laws and policies were having on their ability to interact with local officials, as well as the information we have reviewed to date, we believe these policies and others like them may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects," which "would be inconsistent with and prohibited by Section 1373." *Id.* at AR-00373.  The OIG Report expressly recommended that DOJ "[r]equire grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support the certification." *Id.* at AR-00374.

As mentioned above, in the FY 2016 grant cycle, under the prior Administration, DOJ introduced a requirement to certify compliance with Section 1373.  *See* AR-00384 (July 7, 2016 OJP Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program).  For the FY 2017 cycle, DOJ maintained the Section 1373 condition, added the notice and access conditions, and publicly offered a sound explanation for all three conditions.  DOJ's July 25, 2017 "Backgrounder on Grant Requirements" states that the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe."  AR-00993.  The Backgrounder notes that some

41

jurisdictions have "refus[ed] to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes," and states that the conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id.* For the FY 2018 cycle, the challenged conditions continue with these same goals. The conditions are "common-sense measures," *id.*, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 521 (2009).

Immigration enforcement—particularly against aliens who have committed crimes—undoubtedly relates to criminal justice. Numerous federal statutes expressly tie these two subjects together—most centrally through the statutory determination that conviction of any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), thus eliminating their potential to re-offend. *See* 2007 OIG Audit at AR-00014 (observing, in analyzing the recidivism of criminal aliens released from state or local custody, that if the examined "data is indicative," then "the rate at which released criminal aliens are rearrested is extremely high"). Accordingly, a July 25, 2017, press release by the Attorney General, accompanying the Backgrounder, stated DOJ's opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." AR-00992 (DOJ Press Release No. 17-826).

Relatedly, as explained above, the INA mandates that aliens who have committed certain criminal offenses be taken into federal custody pending removal

proceedings, but only when the alien is released from state custody.  *See* 8 U.S.C. §

1226(c)(1).  Thus, the release of an alien who has been convicted of certain criminal

offenses from state custody constitutes a triggering event for one of the federal

government's core responsibilities under the INA—*i.e.*, the removal of criminal aliens.

The notice and access conditions plainly facilitate the fulfillment of this statutory

responsibility—the former by allowing federal immigration authorities to interview aliens

*during* their state custody to determine whether they should be removed upon the

conclusion of that custody,[8] and the latter by greatly reducing the resources and risk

involved in ICE taking qualifying criminal aliens into custody.  *See* Decl. of Caridad

Cephas-Kimbrough, U.S. Immigration and Customs Enforcement ("Cephas-

Kimbrough Dec."), ¶ 8 (contrasting situations in which ICE officers are able to take

qualifying criminal aliens into federal custody in a "controlled, law enforcement setting,

where they have been searched for weapons and contraband" with efforts to detain

aliens "at-large in the community," where "other people may be present, the

surroundings are not secure, and individuals may be armed or ready to flee").  Such

lack of local or state law enforcement cooperation "heighten[s] the risk that is already

inherent in at-large operations" for ICE agents.  *Id.*  And, as Deputy Assistant Director

Cephas-Kimbrough confirms, "[P]rior to these limitations on cooperation, state and local

officers would accompany ICE officers to residences in order to provide a uniformed

presence and serve as a deterrent to resistance to ICE's enforcement efforts, as well as

---

[8] See 8 U.S.C. § 1357(a), under which certain federal immigration officers and
employees "have power without warrant . . . to interrogate any alien or person believed
to be an alien as to his right to be or to remain in the United States," and 8 C.F.R.
§ 287.5(a), under which that power may be exercised "anywhere in or outside the
United States."

Case 1:19-cv-00736-JLK   Document 26   Filed 07/30/19   USDC Colorado   Page 52 of 60

allowing for the arrest of individuals who illegally interfered with such efforts." *Id.* Given

that the INA expressly contemplates local law enforcement activity with respect to

immigration law enforcement, it is perfectly rational for DOJ to condition grant funding to

promote these purposes.

For these reasons, the conditions rationally promote interests in "maintain[ing]

liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. §

10102(a)(2), and comport with the inter-governmental cooperation that Congress

contemplates in immigration enforcement.  *See*, *e.g.*, 8 U.S.C. §§ 1226(d), 1231(i),

1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state

officials is an important feature of the immigration system" and Congress "has

encouraged the sharing of information about possible immigration violations." (citation

omitted)).  Because "the agency's reasons for" imposing the challenged conditions

"were entirely rational," the plaintiff's claims fail. *Fox TV*, 556 U.S. at 517.

**IV.    Sections 1373 and 1644 are Consistent with the Tenth Amendment.**

**A. The Constitutionality of Sections 1373 and 1644 Need Not be Decided by this Court.**

The plaintiff contends that Sections 1373 and 1644 impermissibly directs the

functioning of local government in contravention of Tenth Amendment.  *See* Am. Compl.

¶¶ 97-101.  The FY 2018 Byrne JAG program seeks to encourage the free-flow of

communication between federal authorities and state or local personnel regarding

immigration issues.  To accomplish this, Special Conditions 41-43 incorporate by

reference some of the substantive concepts found in Section 1373,[9] as independent conditions upon the grantee.  Significantly, this is *not* enforcement of Section 1373 as a stand-alone statute.  Nor are the defendants attempting to enforce Section 1373 against the plaintiff in this litigation.  As such, the Court need not determine the constitutionality of Section 1373 as a stand-alone statute.  "Courts have a duty to avoid unnecessarily deciding constitutional issues."  *United States v. House of Representatives of the United States*, 556 F.Supp.150, 152 (D.C. Cir. 1983) (citing *United States v. Rumely*, 345 U.S. 41, 45-46 (1952)).  Rather, the Court should analyze only whether the relevant Special Conditions are appropriate under the Spending Clause analysis.  As demonstrated above, these Special Conditions are germane to the federal interest in the Byrne JAG program and are sufficiently clear.  The Court's analysis should stop here.

### B. The Sections Validly Guard Against Frustration of the Federal Immigration Statutory Design.

In any event, § 1373 is entirely consistent with the Tenth Amendment.  As noted, the statute provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing with federal immigration authorities "information regarding the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a); *see also id.* § 1373(b) (similar).  The statute does not require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).  Nor does it require jurisdictions to enforce a federal regulatory scheme, as in

---

[9] Sections 1373 and 1644 are substantively similar. For convenience, reference will be made only to Section 1373, but defendants' arguments supporting one section apply equally to the other.

*Printz v. United States*, 521 U.S. 898 (1997). Rather, § 1373 is a permissible information-sharing requirement that preempts State and local governments from hindering the federal government's enforcement of the immigration laws against individual aliens.

As applied here, § 1373 pertains to the effects of state and local criminal custody on the INA's regulatory scheme concerning the removal and detention of individual aliens. The INA provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that localities provide DHS with information regarding immigration status (such as an alien prisoner's release date, which is essential to determining when the alien can be removed)—or § 1373's narrower requirement that localities *may not restrict* their officers from sharing such information with DHS—merely prevents localities from using the criminal-law authority over aliens that Congress has allowed them to retain in a manner that frustrates the operation of the parallel federal regulatory scheme for potential removal or detention upon aliens' release from local custody. Even if Congress had not enacted § 1373, that would follow from basic

principles of obstacle preemption.  *See Arizona v. United States*, 567 U.S. 387, 399

(2012).  Congress did not create a scheme in which the federal government shall take

custody of aliens upon their release from state criminal custody without having any

mechanism for ascertaining when the alien would be released.  The INA's allowance for

state criminal custody to be completed before removal is premised on the assumption

that the federal government will be able to learn such aliens' release dates and

seamlessly take them into federal custody in a safe and orderly manner.

The legislative history of § 1373 confirms this understanding.  Congress first

prohibited restrictions on the sharing of "information regarding" an alien's "immigration

status" as a response, in part, to laws enacted by "[v]arious localities" that "prevent[ed]

local officials from disclosing the immigration status of individuals to INS."  H.R. Rep.

No. 104-725, at 391 (1996).  The House Conference Report explained that the statute

was intended to "give State and local officials the authority to communicate with the INS

regarding the presence, whereabouts, or activities of illegal aliens."  *Id.* at 383; *see id.*

(the provision "is designed to prevent any State or local" prohibition or restriction on

"any communication between State and local officials and the INS").

### C.  The Sections are Constitutional under *Murphy v. NCAA* and other Controlling Precedent.

*Murphy* expressly did not disturb the bedrock principle that state and local laws

that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]."  138 S. Ct. at

1479.  That principle could not save the statute at issue in *Murphy*, which did not

"impose any federal restrictions on private actors," but instead sought to prohibit States

from authorizing sports gambling schemes.  *Id.* at 1481.  By contrast, where, as here,

both sovereigns regulate private individuals, the issue is not whether the federal

government has commandeered a State, but whether the State's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce.").

Congress could have provided for immediate removal of aliens regardless of pending local criminal prosecutions. Allowing local criminal custody to continue while requiring that localities facilitate the effectuation of—or at least not interfere with—an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the locality into enforcing federal law, but merely places conditions on the locality's exercise of its own regulatory authority. *See Hodel*, 452 U.S. at 290-91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). In sum, so long as Congress is expressly (or implicitly) preempting a locality from interfering with federal regulation of private parties, it is not impermissibly regulating the locality directly.

Plaintiff misunderstands the relevant analysis when it alleges that Section 1373 forces the states to regulate in a certain way. As the Supreme Court admonished in *Murphy,* "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States"—even in a targeted way—but in substance merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). That is exactly what § 1373 does: it preempts States and localities from hindering the INA's regulation of aliens.

48

Plaintiff effectively asserts that it may use its regulatory authority over persons who are also subject to federal regulatory authority in a way that impedes the operation of federal law.  But this gets the matter backwards.  By affirmatively asserting criminal custody over aliens whom the federal government seeks to detain and remove, plaintiff's scheme impairs the exercise of the parallel federal scheme unless plaintiff terminates custody in a manner that does not hinder the federal government in assuming custody.  It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme.

The federal government is not requiring plaintiffs to enforce federal law by arresting particular individuals or extending their custody.  *See Printz*, 521 U.S. at 926 (citing *New York*, 505 U.S. at 188).  Instead, it is the federal government that seeks to assume custody, and only of those aliens whom plaintiff has already decided, for its own reasons, to take into custody pursuant to state criminal law.  The federal government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority.

Moreover, even if § 1373 could properly be analyzed apart from the INA's general regulatory scheme, a requirement to not interfere with a federal inquiry about an alien's release date or other information regarding immigration status would in no sense be "commandeering" local officials to execute federal law.  In *Printz*, the Supreme Court held that local law-enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law.  At the same time, it distinguished statutes that "require only the provision of information to the Federal

Government," as they "do not involve . . . the forced participation of the States'

executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918.

The Supreme Court's Tenth Amendment cases are not properly read to invalidate

reporting requirements, such as the requirement for "state and local law enforcement

agencies to report cases of missing children to the Department of Justice." *Id.* at 936

(O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see Reno v. Condon*, 528 U.S.

141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require

the States in their sovereign capacity to regulate their own citizens," but instead

"regulate[] the States as the owners of data bases").

## V.   Plaintiff is Not Entitled to Declaratory, Mandamus, or Injunctive Relief.

Plaintiff seeks a declaratory judgment in the Amended Complaint.  For the

reasons set forth above, the challenged conditions are valid, and plaintiff is not entitled

to such relief.

Additionally, plaintiff seeks a writ of mandamus to compel the defendants to

disburse the Byrne JAG grants without the challenged conditions.  *See* Am. Compl. at

29.  Plaintiff has not shown, however, that the defendants have failed to take a legally

*required* action, and thus is not entitled to a writ of mandamus compelling defendants to

act on its application.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004).

The Byrne JAG statute provides that the Attorney General "may" make grants from

appropriated funds to carry out the purposes of the program, 34 U.S.C. § 10152(a)(1),

and does not set any deadline for the Department to issue decisions on Byrne JAG

applications, which, in any event, are funded from appropriations that are "available until

expended" and therefore do not lapse at the end of a fiscal year.  *See, e.g.*,

Consolidated Appropriations Act, Pub. L. No. 115-141, Div. B, Title II, 132 Stat. 348, 420 (2018).  Thus, because there is discretionary action at issue, mandamus relief is unwarranted.

Finally, plaintiff seeks an injunction ordering the defendants to disburse the FY 2018 Byrne JAG funds to plaintiff.  A party seeking an injunction must "establish . . . that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  These factors merge in a suit against the federal government.  *Niken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the public interest weighs heavily against the plaintiff's attempt to enjoin statutorily authorized Executive Branch policies that are designed to promote the enforcement of federal immigration law in jurisdictions that receive federal law enforcement funds. Courts have routinely held that "the United States has an interest in enforcing federal law." *Acosta v. Idaho Falls Sch. Dist. No. 91*, 291 F. Supp. 3d 1162, 1168 (D. Idaho 2017) (*quoting United States v. E. Baton Rouge Parish Sch. Bd.*, 594 F.2d 56, 58 (5th Cir. 1979)).  Plaintiff's requested relief threatens, in particular, the "strong interest . . . in the effective and efficient enforcement of the nation's immigration laws," *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV172048PSGSHKX, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018), as well as the federal government's interest in seeing that federal funds are used "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980).

The challenged conditions promote these interests by promoting operational efficiency by conserving the resources needed by DHS to execute its mission;

supporting the federal ability to remove criminal aliens from the country; and helping

reduce federal expenditures on the State Criminal Alien Assistance Program, *see* 8

U.S.C. § 1231(i), under which the Federal Government compensates states and

localities for their incarceration of certain criminal aliens.  At bottom, encouraging

cooperation among local governments and federal immigration authorities promotes the

public interest in executing federal laws that require removal of criminal aliens.  These

concrete interests tip the equities in this case sharply toward denying an injunction.


## CONCLUSION

For the reasons set forth above, the Court should grant the defendants' motion to

dismiss the plaintiff's claims challenging the conditions, or alternatively, grant

defendants' motion for summary judgment on those same claims.


Respectfully submitted,

**JOSEPH H. HUNT**
Assistant Attorney General

**JOHN R. TYLER**
Assistant Branch Director

 /s/ *Daniel D. Mauler*
**DANIEL D. MAULER**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

*Counsel for Defendants*