**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-0736-JLK

STATE OF COLORADO,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE, and
WILLIAM PELHAM BARR, in his official capacity as
Attorney General of the United States,

      Defendants

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS, OR IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Defendants United States Department of Justice and William P. Barr, in his

official capacity as Attorney General of the United States, submit the following in reply in

support of their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment

(ECF NO. 26) and in opposition to Plaintiff's Combined Motion for Summary Judgment

(ECF No. 35).

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

DEFENDANTS' RESPONSES TO PLAINTIFF'S STATEMENT OF
ADDITIONAL UNDISPUTED FACTS ............................................................................ 2

ARGUMENT .............................................................................................................. 13

    I.    Plaintiff Fails to Demonstrate that Defendants Lack Statutory
          Authority to Enforce the Challenged Conditions on a Federal
          Grant. ..................................................................................................... 13

          A.    The Conditions are Authorized by 34 U.S.C. § 10102(a)(6) ............... 13

          B.    The Conditions are Authorized by 34 U.S.C. § 10153. ...................... 16

          C.    The Formula Nature of the Byrne JAG program does not
                prevent the Imposition of Conditions. ................................................ 18

    II.    Sections 1373 and 1644 are Consistent with the Tenth
          Amendment. ........................................................................................... 19

    III.    The Challenged Conditions Do Not Violate the Spending
          Clause. ................................................................................................... 23

          A.    Congress may Delegate Authority to Impose
                Spending Conditions. ......................................................................... 23

          B.    The Conditions are Sufficiently Related to the
                Purposes of the Byrne JAG Program. ............................................... 25

    IV.    The Challenged Immigration Conditions are Reasonable and Do
          Not Violate the Administrative Procedure Act. ....................................... 27

    V.    Plaintiff is Not Entitled to Declaratory, Mandamus, or Injunctive
          Relief. .................................................................................................... 28

CONCLUSION .......................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Alaska Oil & Gas Ass'n v Jewell*,
   815 F.3d 544 (9th Cir. 2016))....................................................................... 28

*Arizona v. United States*,
   567 U.S. 387 (2012) ...................................................................................... 21

*City and County of San Francisco v. Sessions*,
   372 F. Supp. 3d 928 (N. D. Cal. 2019) ....................................................... 18, 22, 26

*City of Los Angeles v. Barr*,
   941 F.3d 931 (9th Cir. 2019)........................................................................ 15

*City of Los Angeles v. Barr*,
   929 F.3d 1163 (9th Cir. 2019)................................................................. 24, 25, 26, 28

*City of Chicago v. Sessions*,
   321 F.Supp.3d 855 (N.D. Ill. 2018) ............................................................. 18, 22

*City of Chicago v. Sessions*,
   888 F.3d 272 (7th Cir. 2018),
   *reh'g en banc granted in part*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).............. 15

*City of Philadelphia v. Sessions*,
   916 F.3d 276 (3d Cir. 2019)......................................................................... 14, 18

*City of Philadelphia v. Sessions*,
   280 F. Supp. 3d 579 (E.D. Pa. 2017)........................................................... 26, 28

*City of Providence v. Barr*,
   385 F. Supp. 3d 160 (D. R. I. 2019) ............................................................. 18

*Kansas v. United States*,
   214 F.3d 1196 (10th Cir. 2000).................................................................... 25

*Mayweathers v. Newland*,
   314 F.3d 1062 (9th Cir. 2002)...................................................................... 25

*Murphy v. National Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ................................................................................. 20, 21, 22

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................. 20, 22, 25

*N.L.R.B. v. Noel Canning*,
    134 S. Ct. 2250 (2014) ........................................................................ 15

*Norfolk & W. Ry. v. American Train Dispatchers Ass'n*,
    499 U.S. 117 (1991) ....................................................................... 17, 18

*Oregon v. Trump*,
    __ F. Supp. 3d __, 2019 WL 3716932 (D. Or. Aug. 7, 2019) ............ 15, 22

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .............................................................................. 24

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................. 20, 22, 23

*Reno v. Condon*,
    528 U.S. 141 (2000) ........................................................................... 23

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................................... 25

*State of New York v. Dep't of Justice*,
    343 F. Supp. 3d 213 (S.D.N.Y. 2018*)* ........................................ 18, 22, 28

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ............................................................................ 14

*United States v. Atlantic Research Corp.*,
    551 U.S. 128 (2007) ..................................................................... 15, 16

## STATUTES

8 U.S.C. § 1226 .................................................................................. 6, 20

8 U.S.C. § 1231 .................................................................................. 6, 20

8 U.S.C. § 1324 ..................................................................................... 7

8 U.S.C. § 1357 ..................................................................................... 6

8 U.S.C. § 1366 ..................................................................................... 7

8 U.S.C. § 1373 ............................................................................... *passim*

8 U.S.C. § 1644 ................................................................................................... *passim*

34 U.S.C. § 10102 .......................................................................................... 13, 14, 15

34 U.S.C. § 10152 .............................................................................................. 16, 17

34 U.S.C. § 10153 ......................................................................................... 13, 16, 17

34 U.S.C. § 10156 .................................................................................................... 17

34 U.S.C. § 10202 .................................................................................................... 16

34 U.S.C. § 10228 .................................................................................................... 27

34 U.S.C. § 10251 .................................................................................................... 26

42 U.S.C. § 3712 (2000) ..................................................................................... 13, 16

42 U.S.C. § 5779 ...................................................................................................... 23

42 U.S.C. § 16154 .................................................................................................... 17

49 U.S.C. app. § 1305 (1988) .................................................................................. 22

Violence Against Women and Department of Justice Reauthorization Act of 2005,
    Pub. L. No. 109-162, 119 Stat. 2960 (2006) ................................................... 14

Water Resources Reform and Development Act of 2014,
    Pub. L. No. 113-121, 128 Stat. 1193 ............................................................... 17

**REGULATIONS**

2 CFR § 200.207 ...................................................................................................... 15

28 C.F.R. § 66.12 (2006) ......................................................................................... 15

**RULES**

Fed. R. Civ. P. 56 ................................................................................................ *passim*

**OTHER AUTHORITIES**

H.R. Rep. No. 104-725 (1996) .................................................................................. 21

H.R. Rep. No. 109-233 (2005) .................................................................................. 14

**INTRODUCTION**

Plaintiff urges that the Federal Government cannot condition a law enforcement grant on an assurance that it will not impede the enforcement of federal immigration law. The array of statutory and constitutional provisions marshalled in Plaintiff's brief do not vindicate that counter-intuitive proposition.

Plaintiff does not dispute that aliens are subject to regulation both under the state's own criminal laws and also under the federal immigration laws. Plaintiff does not dispute that state criminal processes take precedence over federal immigration enforcement only because Congress, through the Immigration and Nationality Act (INA), has determined that this should be the case. Plaintiff does not dispute that Congress made this determination based on the assumption that there would be a seamless transition of custody to the Federal Government, as reflected in the statutory directives to the Department of Homeland Security (DHS) to detain and remove aliens promptly after they are released. And Plaintiff does not dispute that it frustrates the operation of federal law when it refuses to respond to inquiries regarding a prisoner's release date or otherwise refuses to cooperate with federal immigration officers.

Nothing in the governing statute or the Constitution requires that the Federal Government, in dispensing law enforcement grants, disregard a jurisdiction's failure to provide the minimal level of cooperation necessary to permit effective law enforcement by the Federal Government as well as state and local governments. In urging to the contrary, Plaintiff engrafts atextual limitations on to the Byrne JAG statute and deprives the actual text of meaning. And Plaintiff's assertions that the grant conditions offend the Administrative Procedure Act (APA), the Tenth Amendment, or the Spending Clause are

1

without sound basis in governing doctrine.  Defendants are entitled to judgment on all of Plaintiff's claims.

**DEFENDANTS' RESPONSES TO PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

1. The State has applied for and received Byrne JAG funding every year from 2005 through 2017. Colorado's annual Byrne JAG grants have ranged from $1.5 to $4.7 million. From 2005 through 2017, Colorado received a total of $39,659,445 in Byrne JAG grant funds. Ex. 1, ¶ 4.

**Defendants' Response:**   Undisputed.

2. For FY 2018, the State and its subgrantees plan to use Byrne JAG funds for a variety of critical law enforcement needs, including the following:

   a. The Colorado Bureau of Investigation (CBI) uses ballistic imaging technology to analyze spent cartridges in order to connect shooting incidents or to relate shooting incidents to a specific firearm.  CBI seeks to use FY 2018 Byrne JAG funding to hire a technician in order to provide this technology to law enforcement agencies throughout the state. Ex. 1, attach. 4 at p. 2.

   b. The Montezuma County Sheriff's Office plans to hire three deputies to provide security for the County's four courtrooms. Affidavit of Steve Nowlin attached as Exhibit 2, ¶5.  The need for courtroom security is "dire." *Id.* at ¶6. In the past year, assaults by criminal defendants in the County's courtrooms have resulted in serious

2

bodily injuries. *Id.* at ¶9. If the Sheriff's Office does not receive its

FY 2018 grant, it will be unable to hire additional deputies. *Id.* at ¶5.

c.  The City of Alamosa has funded a youth and young adult diversion

program with Byrne JAG funds and has requested FY 2018 funds

to continue the program. *Affidavit of Heather Brooks* attached as

Exhibit 3, ¶¶5, 6. The program will shut down if Alamosa does not

receive the FY 2018 funds. *Id.* at ¶5.

d.  The Denver Department of Human Services (DDHS), in partnership

with the University of Denver, has used past Byrne JAG funds to

expand a juvenile delinquency prevention program. *Affidavit of*

*Rachel Flank Goldberg* attached as Exhibit 4, ¶6. If DDHS does not

receive its requested FY 2018 funds, the department will lay off the

program coordinator and program facilitators. *Id.* at ¶7.

e.  The Denver Housing Authority (DHA) has established a program

offering high school credit, employment training, and activities for

teenagers living in public housing. *Affidavit of Ismael Guerrero*

attached as Exhibit 5, ¶5. If DHA does not receive its requested FY

2018 Byrne JAG funds, DHA will lay off the employees who

coordinate the project. *Id.* at ¶7.

f.  The City of Bayfield Marshal's Office has requested FY 2018 Byrne

JAG funds to hire an officer to lead new community outreach

programs. *Affidavit of Joseph McIntyre* attached as Exhibit 6, ¶8.

Bayfield is a growing community with an increasing need for law

enforcement personnel. *Id.* at ¶11. If the Bayfield Marshal's Office does not receive its FY 2018 Byrne JAG funds, it will be unable to hire the officer. *Id.* at ¶¶9, 10.

**Defendants' Response**:   Not an assertion of material facts.  *See* Fed. R. Civ. P. 56(c). In reality, Paragraph 2 and its subparts merely set forth intended uses for grant funds, and such intentions have no effect upon the legal issues disputed in this case.

3.  For FY 2018, DOJ imposed seven immigration-related conditions (Challenged Conditions) on the receipt of Byrne JAG grants. Ex. 1, ¶10. DOJ requires the State to agree to the following in order to validly accept a FY 2018 Byrne JAG grant:

  a.  Special Condition 41 (Compliance Condition) requires the State's chief legal officer to certify that the State will comply with both 8 U.S.C. §§ 1373 and 1644. Both statutes prohibit state or local governmental entities from restricting, or being restricted from, communications with federal immigration authorities regarding the lawful or unlawful immigration status of an alien. *Id.*, attach. 2, p. 16;

  b.  Special Condition 42 (Ongoing Compliance Condition) directs the State to refrain from restricting communications between state and local officials and federal immigration authorities and requires the State to monitor itself and its subgrantees for compliance with §§ 1373 and 1644. *Id.*, p. 17;

c.  Special Condition 43 (§§ 1373 and 1644 Condition) forbids the State from awarding subgrants to recipients with a policy violating §§ 1373 or 1644 and requires the State to monitor its subgrantees for compliance. The State's drawdown of grant funds "shall be considered . . . to be a material representation" by the State that as of the date of the drawdown, "the [State] and each subrecipient" is in compliance with §§ 1373 and 1644. *Id.*, p. 18;

d.  Special Condition 44 (Harboring Condition) forbids the State from disclosing "federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice . . . or any alien," and requires the State to monitor the subgrantees' compliance with this condition. *Id.*, p. 19;

e.  Special Condition 45 (Access Condition) forbids the State from "impeding access" to state and local correctional facilities by federal agents who seek to interrogate "any person believed to be an alien" about the individual's immigration status and requires the State to monitor subgrantees' compliance with this condition. *Id.*, p. 20;

f.  Special Condition 46 (Notice Condition) requires the State and its subgrantees to provide the Department of Homeland Security (DHS) with advance notice of an incarcerated alien's release date and requires the State to monitor subgrantees' compliance with this condition. *Id.*, p. 21;

    g. Special Condition 47 (Questionnaire Condition) requires the State, as a condition of making awards to subgrantees, to collect and retain for review by DOJ, information from subgrantees with respect to laws, policies, or practices related to communications with DHS or Immigration and Customs Enforcement (ICE). *Id.*, p. 22.[1]

**Defendants' Response:** Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c). In reality, paragraph 3 and its subparts merely characterize legal authority set forth in the Byrne JAG program.  The Court is respectfully referred to the cited authority for a complete and accurate statement of its contents.

    4. DOJ also requires the State to make the following three certifications in order to "accept" its FY 2018 Byrne JAG award:

    a. The first, which the State's chief executive must sign, certifies the State's compliance with §§ 1373, 1644, and other federal immigration statutes[2] and adopts "as my own" similar certifications by subgrantees. Ex. 1, attach. 1, p. 41;

---

[1] This condition requires each applicant to answer the following: 1) whether the jurisdiction has any laws, polices, or practices related to whether, when, or how employees may communicate with DHS or ICE; and 2) whether the jurisdiction is subject to any laws from a superior entity (e.g., a state law that binds a city) that meet the description in question 1. If the answer is "yes" to either, each grantee or subgrantee must provide a copy of the policy or law, describe each practice, and explain how the policy or practice complies with § 1373. Ex. 1, attach. 1, pp. 27-28.

[2] These statutes include: 8 U.S.C. § 1226(a), (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released); 8 U.S.C. § 1231(a)(4) (providing that federal government may not "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"); 8 U.S.C. § 1357(a) (authorizing immigration

    b. The second, required by Special Condition 41, requires the State's chief legal officer to certify that the State and all subgrantees have no policy or restriction inconsistent with §§ 1373 and 1644. *Id.*, p. 43;

    c. The third requires the State's chief legal officer to certify that the grantee and all subgrantees have no policy, law or practice in effect that would impede the ability of federal officers to comply with several enumerated immigration-related statutes,[3] or policies or practices that that aid or abet the harboring or shielding from detection any illegal alien. *Id.*, p. 45.

**Defendants' Response**: Not assertions of material facts. *See* Fed. R. Civ. P. 56(c). In reality, paragraph 4 and its subparts merely characterize legal authority set forth in the Byrne JAG program. The Court is respectfully referred to the cited authority for a complete and accurate statement of its contents.

5. Each required FY 2018 certification carries the risk of personal criminal prosecution, civil penalties, and administrative remedies. *Id.*, pp. 41, 43, 45.

---

officers to "interrogate any person believed to be an alien" regarding that person's immigration status); and 8 U.S.C. §1366(1), (3) (requiring the Attorney General to submit to Congress and annual report detailing the number of illegal aliens incarcerated in state and federal prisons for the commission of felonies).

    [3] The statutes include the those cited in the previous certification (see footnote 4) and, in addition, 8 U.S.C. § 1324 (a) (forbidding any "person" from concealing, harboring, or shielding from detection, any person present in the United States "in violation of law").

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c).  In

reality, paragraph 5 merely characterizes legal authority set forth in the Byrne JAG

program.  The Court is respectfully referred to the cited authority for a complete and

accurate statement of its contents.

6.  Colorado applied for a FY 2018 Byrne JAG grant. Ex. 1, ¶8. On October 1,

2018, the State received notification that the Office of Justice Programs

approved the State's 2018 Byrne JAG award of $2,796,761, subject to the

State's agreement to the grant's Special Conditions. Ex. 1, ¶¶ 8, 9, 10; id,

attach. 2, p. 1.

**Defendants' Response**:  Undisputed.

7.  After reviewing the FY 2018 immigration-related Special Conditions and

required certifications, the State determined that Colorado could not

comply or certify compliance. The State identified two main reasons for

objecting to the immigration-related conditions:

a.  First, the State believed that it was administratively impossible to

monitor subgrantees' compliance with the conditions. *Id.* at ¶11.

The State lacked the personnel to conduct the extensive monitoring

required, lacked authority to force local and municipal agencies to

comply, and lacked the means of enforcing penalties against those

that refused to comply. *Id.*

      b.  Second, the State believed that compliance with the conditions would greatly and irreversibly diminish immigrant communities' trust in law enforcement. *Id.*

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c).  In reality, paragraph 7 and its subparts merely characterize the beliefs and intentions of Plaintiff, which are irrelevant to the disputed legal issues in this case.

    8.  The State, and some subgrantees, have determined that public safety and public engagement is best promoted without their involvement in the enforcement of federal immigration law. Ex. 1, ¶11; Ex. 4, ¶11; Ex. 6, ¶12.

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c).  In reality, paragraph 8 merely characterizes the beliefs and intentions of Plaintiff, which are irrelevant to the disputed legal issues in this case.

    9.  If members of immigrant communities believe that law enforcement authorities are providing federal authorities with information on individuals' immigration status, they are less likely to communicate with officers or share valuable information. Ex. 1, ¶11; Ex. 6, ¶ 12.

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c).  In reality, paragraph 9 merely characterizes the beliefs and intentions of Plaintiff, which are irrelevant to the disputed legal issues in this case.

10. As a result, Colorado communities may be less safe, crime may increase, and the rate of unsolved crime may rise. Ex. 1, ¶ 11.

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c).  In reality, paragraph 10 merely characterizes the beliefs and opinions of Plaintiff, which are irrelevant to the disputed legal issues in this case.

11. On October 15, 2018, by letter, the State accepted its 2018 grant funds subject to the caveat that the State regarded three of the Challenged Conditions (the Compliance, Access, and Notice Conditions) as unlawful and unenforceable as to Colorado. Ex. 1, ¶12.

**Defendants' Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c).  Rather, Paragraph 11 merely asserts a legal theory that requires no response from Defendants.  Additionally, Defendants dispute that Plaintiff's "caveat" has any legal effect whatsoever.

12. On December 24, 2018, the State's Division of Criminal Justice (DCJ) sent the Governor a memo describing 45 projects and programs that would be funded by the State's FY 2018 Byrne JAG grant. Ex. 1, ¶ 13. The memo accurately describes those projects and programs. *Id.*

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c). Plaintiff's internal memo has no effect upon the disputed legal issues in this case.

13. In January 2019, the DOJ's Bureau of Grant Administration (Grant Bureau), the department within the Office of Justice Programs established to administer grants, informed the State that it had "prematurely" awarded the State its FY 2018 Byrne JAG grant. Ex. 1, ¶ 14. The Grant Bureau regarded the caveat in the State's October 15, 2018 letter as a material change to the grant award that disqualified the State as a grant recipient. *Id.* The Grant Bureau gave the State until March 1, 2019 to rescind its caveat about the immigration-related special conditions. *Id.*

**Defendants' Response**:  This paragraph includes a mistaken reference to DOJ's "Bureau of Grant Administration" and no such entity exists.  Defendants assume the reference is intended to DOJ's Bureau of Justice Assistance.  The remaining factual statements are undisputed.

14. On March 1, 2019, the State advised the Grant Bureau that Colorado would not rescind its objections to the immigration-related special conditions. *Id.*, ¶ 15.

**Defendants' Response**:  Undisputed.

15. On or about March 7, 2019, the Grant Bureau informed the State it would not approve the State's application because the State contested the immigration-related special conditions. *Id.,* ¶ 16. However, the Grant Bureau said it would award the State its 2018 Byrne JAG funds if the State rescinded its objections. *Id.*

**Defendants' Response**:  Undisputed.

16. On September 23, 2019, the Grant Bureau again informed the State that it would not distribute the 2018 funds unless the State withdrew its objections to the immigration-related special conditions. The Grant Bureau planned to close the award and "de-obligate" the funds if the State did not comply. *Id.*, ¶ 17.

**Defendants' Response**:  Undisputed.

17. As a result of the Grant Bureau withholding the State's $2.7 million Byrne JAG grant, state agencies, local law enforcement bodies, and judicial districts have gone without crucial funding. Byrne JAG funding would have been used to purchase equipment, hire law enforcement officers and other personnel, fund rehabilitation programs, increase community policing efforts and programs, and create innovative criminal justice programs. The lack of these funds has a negative impact on the welfare, safety, and security of Coloradans. *Id.*, ¶ 18.

**Defendants' Response**:  Not assertions of material facts.  *See* Fed. R. Civ. P. 56(c). Plaintiff's intended use for the grant funds has no effect upon the disputed legal issues in this case.

## ARGUMENT

**I.     Plaintiff Fails to Demonstrate that Defendants Lack Statutory Authority to Enforce the Challenged Conditions on a Federal Grant.**

Plaintiff's opening brief argues that the Defendants lack statutory authority to enforce the conditions challenged in this case (*see* Pl.'s Br. 27-38).[4]  Plaintiff fails to fully grapple with the Defendants' arguments to the contrary set forth in their opening brief.  *See* Defs.' Br. 22-26.[5]

Congress delegated ample and sufficient authority to Defendants to require compliance with the challenged conditions.  Such authority flows from several independent sources, including:  34 U.S.C. § 10102(a)(6) and 34 U.S.C. § 10153.  And, finally, the formula-nature of the Byrne JAG program does not relieve a grantee of complying with valid conditions on such a grant.

### A.  The Conditions are Authorized by 34 U.S.C. § 10102(a)(6).

When Congress created the Byrne JAG program in 2006, the Assistant Attorney General for Office of Justice Programs (AAG) already possessed the authority to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General." 42 U.S.C. § 3712(a)(6) (2000). In the same statute that created the Byrne JAG program, Congress amended this language so that it now encompassed the authority to exercise "powers and functions . . . . vested in the [AAG] pursuant to this chapter [101 of Title 34] or by delegation of the

---

[4] "Pl.'s Br." refers to Plaintiff's Combined Motion for Summary Judgment and Response to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (ECF No. 35), filed in this matter on October 21, 2019.

[5] "Defs.' Br." refers to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (ECF No. 26), filed in this matter on July 30, 2019.

Attorney General, including *placing special conditions* on all grants, and *determining priority purposes* for formula grants." 34 U.S.C. § 10102(a)(6) (emphases added); *see* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006). The legislative history of the Byrne JAG program confirms that the language added in 2006 "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

In its opening brief, Plaintiff fails to address this significant 2006 statutory amendment.  *See* Defs.' Br. 23-24.  Thus, Plaintiff effectively urges that the new language accomplished precisely nothing.[6]  *See* Pl.'s Br. 34-38.  Accordingly, Plaintiff essentially argues that any powers listed after the word "including" could not expand the powers that already existed.  Plaintiff's reading thus runs headlong into the rule that "no clause, sentence, or word shall be [rendered] superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  And this significant error undercuts the reasoning of the contrary cases relied upon by Plaintiff.  *See City of Philadelphia v. Sessions*, 916 F.3d 276, 287 (3d Cir. 2019) (holding that § 10102(a)(6) provides the AAG the "power to place special conditions on grants only to the extent that such power

---

[6] Plaintiff includes a short argument that Section 10102(a)(6) is "in a different subchapter than Byrne JAG and is not applicable to the Byrne JAG program at all."  *See* Pl.'s Br. 34-35.  Plaintiff is simply mistaken here.  While Section 10102(a)(6) is in a different subchapter than the statutes that outline the Byrne JAG program, Section 10102(a)(6) delegates powers to Assistant Attorney General (AAG) overseeing the Office of Justice Programs (which administers the Byrne JAG program in addition to many other grant programs).  Thus, the powers delegated are applicable to all grant programs that OJP administers, as can be seen by the language of Section 10102(a)(6), which empowers the AAG to "plac[e] special conditions on *all* grants" and "determin[e] priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).

has been vested" in the AAG); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir.

2018), *reh'g en banc granted in part*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018);

*Oregon v. Trump*, __ F. Supp. 3d __, 2019 WL 3716932, at *14 (D. Or. Aug. 7, 2019)

(holding that the 2006 amendment "does little work" and functions as "an exemplification

of the types of power the [AAG] may possess by delegation.").  In fact, the Ninth Circuit

recently rejected this notion that the amendment has no force, concluding that this

argument "deprives the 2006 amendment to § 10102(a)(6) of any meaning" and that the

amendment confirms an expansion of authority for the Defendants to "place 'special

conditions on all grants' and determine 'priority purposes for formula grants.'"  *City of

Los Angeles v. Barr*, 941 F.3d 931, 939 (9th Cir. 2019).[7]

No one doubts that statutory language can "perform[] a significant function simply

by clarifying" the meaning of statutory text, *United States v. Atlantic Research Corp.*,

---

[7] Defendants recognize that the Ninth Circuit ultimately held that the term "special
conditions" was a term of art that allowed the AAG to "impose tailored [individualized]
requirements when necessary, such as when a grantee is 'high risk' pursuant to 28
C.F.R. § 66.12(a)(5) (2006)," and that § 10102(a)(6) "does not authorize DOJ to require
all recipients of Byrne JAG funding to comply with the notice and access conditions."
*Los Angeles*, 941 F.3d at 942.  This portion of the Ninth Circuit's opinion is mistaken,
however, as the Office of Justice Programs (OJP) has long referred to its list of
conditions applicable to all grantees as "special conditions," while conditions directed to
individual grantees are called "additional requirements" or "specific conditions." *See,
e.g.,* Am. Compl., Ex. 1, ¶ 17 (ECF No. 13-1) (Special Condition 17 allowing the
imposition of "additional requirements" if the grantee is designated as "high-risk"); 2
CFR § 200.207(a) (providing that federal awarding agencies "may impose additional
specific award conditions as needed" with certain categories of high risk grantees or
those with "a history of fail[ing] to comply with the general or specific terms and
conditions of a Federal award").  Considering that the 2006 regulation relied upon by the
Ninth Circuit has long since been repealed, the proper definition of "special conditions,"
at least in the context of Byrne JAG grants, reflects OJP's longstanding practice and
understanding, rather than a regulatory term of art that appeared in since-amended
federal regulations.  *Cf. N.L.R.B. v. Noel Canning*, 134 S. Ct. 2250, 2560 (2014) ("the
longstanding practice of government can inform our determination of what the law is").

551 U.S. 128, 137 (2007), but it performs that function where there is some ambiguity that requires clarification in the first place. When the relevant language was added in 2006, the AAG already possessed authority to exercise powers already granted to him by statute or delegated by the Attorney General. *See* 42 U.S.C. § 3712(a)(6) (2000). Plaintiffs surely cannot suggest that Congress needed a statutory amendment to "clarify" or "illustrate" that the AAG possessed authority that Congress had already expressly conferred on him. This argument would transform a grant of authority into meaningless surplusage.

Plaintiff's argument also conflicts with the Department of Justice's longstanding practice—never previously questioned—of imposing numerous and wide-ranging conditions on Byrne JAG awards, including conditions that go beyond those conditions authorized by other statutory and regulatory provisions. For example, in the FY 16 Byrne JAG award to Colorado, the conditions restricting the purchase of certain military-style equipment go beyond the restrictions on "vehicles" and "luxury items" contained in 34 U.S.C. § 10152(d).  *See* FY 16 Byrne JAG Award to Colorado, Ex. 1(K) to Trautman Dec., ¶¶ 43-48 (ECF No. 26-1).  Similarly, the codification of certain conditions relating to body armor in 2016, *see* 34 U.S.C. § 10202(c)(1)(B), (C), occurred *only after* the AAG imposed them as special conditions in 2012. And the AAG has imposed an "American-made" requirement for body-armor purchases, which Congress has not chosen to codify. Am. Compl., Ex. 1 (ECF No. 13-1), ¶ 54.

## B.  The Conditions are Authorized by 34 U.S.C. § 10153.

As Defendants argue in their opening brief, the challenged conditions are also authorized by 34 U.S.C. § 10153.  *See* Defs.' Br. 26-27.  In its opening brief, Plaintiff

misunderstands the purpose of other requirements of the Byrne JAG program which permit the Attorney General to "reasonably require" "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to ensure that "there has been appropriate coordination with affected agencies," *id.* § 10153(A)(5)(C). *See, e.g.*, Pl.'s Br. 30-34. Nothing in the text of those provisions limits the "programmatic" information that may be sought to information regarding the handling of federal funds. The better reading is that the "programmatic" information references those programs listed in 34 U.S.C. § 10152(a)(1), including "[l]aw enforcement programs" and "corrections programs."

In its opening brief, Plaintiff attacks Section 10153(A)(5)(D)'s requirement of an applicant's certification to comply with "all other applicable Federal laws," arguing that this actually means "federal law 'applicable' to the grant." *See* Pl.'s Br. 31. But this ignores the actual text enacted by Congress. In the context of the Byrne JAG statute, the phrase "applicable Federal laws" covers laws that apply to Byrne JAG applicants and are constitutionally applied as grant conditions. If Congress had intended to limit the certification to "all laws applicable to Federal grantees," it could have done so expressly, as it has done elsewhere. *See, e.g.*, 42 U.S.C. § 16154(g)(1) ("consistent with the generally applicable Federal laws and regulations governing awards of financial assistance, contracts, or other agreements"); Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, § 1043(a)(3)(C)(ii)(II), 128 Stat. 1193, 1246 ("will comply with all applicable Federal laws (including regulations) relating to the use of those funds"). As the Supreme Court has recognized, "[b]y itself, the phrase 'all other law' indicates no limitation." *Norfolk & W. Ry. v. American Train Dispatchers*

*Ass'n*, 499 U.S. 117, 129 (1991).  *See also City of Chicago v. Sessions*, 321 F.Supp.3d 855, 875 (N.D. Ill. 2018) (concluding that "all other applicable Federal laws" is "read to mean what it literally says." (internal quotation marks omitted)).  This is the correct, textual reading of the statute, and it undercuts the contrary cases that Plaintiff relies upon, which held that "all applicable Federal laws" means something narrower than its facial text.  *See City of Philadelphia*, 916 F.3d at 288-90; *City of Providence v. Barr*, 385 F. Supp. 3d 160, 163-64 (D. R. I. 2019); *City and County of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 946 (N. D. Cal. 2019); *State of New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 231 (S.D.N.Y. 2018).

The bottom line is that Section 10153(A)(5)(D) provides further statutory support for the Defendants to require grantee compliance with federal statutes that apply to grantees.  Plaintiff's cabined reading of the statute should be rejected.

### C. The Formula Nature of the Byrne JAG program does not prevent the Imposition of Conditions.

Relying upon the formula nature of the Byrne JAG program, Plaintiff makes the startling argument that the Defendants may impose *no* conditions on the grant:  "Byrne JAG does not include any provisions authorizing DOJ to apply conditions on funding." Pl.'s Br. 27.  This argument runs head-long into the text of Section 10102(a)(6) described above, as well as the Department's longstanding practice of applying multiple conditions each year since the creation of the Byrne JAG program in 2006.  *See* Defs.' Br. 16-20 (describing the many varied conditions applied to the Byrne JAG program since 2006).

The formula-nature of Byrne JAG does not prevent the Defendants from applying conditions to grant recipients.  The Department, of course, has never claimed authority

to deviate from the statutory formula established by Congress for determining the size of a particular jurisdiction's award, *see* 34 U.S.C. § 10156, and thus would not, absent specific statutory authorization, have authority to partially reduce grant awards in the manner prescribed by the statutes discussed above. That a grantee's allocation is determined by the statutory formula does not excuse a grantee from the requirements of the grant, however, nor does it permit a grantee to demand its share free from special conditions Congress authorized the Department to impose on "all grants" in the statute that created the Byrne JAG program.

## II.    Sections 1373 and 1644 are Consistent with the Tenth Amendment.

For the reasons discussed in Defendants' opening brief, there is no need for this Court to reach the constitutionality of 8 U.S.C. § 1373 and 8 U.S.C. § 1644 as stand-alone statutes. *See* Defs.' Br. 44-45. Rather, the substance of these statutes are legitimately applied as grant conditions, and the Defendants have sufficient authority to apply such conditions, as shown above. Because the Defendants do not seek to enforce the statutes themselves against the Plaintiff in this case, there is no reason for the Court to reach the constitutionality of the statutes.

In any event, Section 1373[8] is consistent with the Tenth Amendment. As noted, the statute provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing with federal immigration authorities "information regarding the citizenship or immigration status" of any individual.  8 U.S.C. § 1373(a); *see also id.* § 1373(b) (similar). The statute does not

---

[8] Sections 1373 and 1644 are substantively similar. For convenience, reference will be made only to Section 1373, but Defendants' arguments supporting one section apply equally to the other.

require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898 (1997).  Rather, § 1373 is a permissible information-sharing requirement that preempts State and local governments from hindering the Federal Government's enforcement of the immigration laws against individual aliens.

As applied here, § 1373 pertains to the effects of state and local criminal custody on the INA's regulatory scheme concerning the removal and detention of individual aliens. The INA provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A).  This permits a state or local jurisdiction to vindicate its justice and penal interests by having a criminal alien serve his sentence before deportation.  But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii).  During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that localities provide DHS with information regarding immigration status (such as an alien prisoner's release date, which is essential to determining when the alien can be removed)—or § 1373's narrower requirement that

localities *may not restrict* their officers from sharing such information with DHS—merely

prevents localities from using the criminal-law authority over aliens that Congress has

allowed them to retain in a manner that frustrates the operation of the parallel federal

regulatory scheme for potential removal or detention upon aliens' release from local

custody. Even if Congress had not enacted § 1373, that would follow from basic

principles of obstacle preemption. *See Arizona v. United States*, 567 U.S. 387, 399

(2012). Congress did not create a scheme in which the Federal Government shall take

custody of aliens upon their release from state criminal custody without having any

mechanism for ascertaining when the alien would be released. The INA's allowance for

state criminal custody to be completed before removal is premised on the assumption

that the Federal Government will be able to learn such aliens' release dates and

seamlessly take them into federal custody in a safe and orderly manner.

The legislative history of § 1373 confirms this understanding. Congress first

prohibited restrictions on the sharing of "information regarding" an alien's "immigration

status" as a response, in part, to laws enacted by "[v]arious localities" that "prevent[ed]

local officials from disclosing the immigration status of individuals to INS." H.R. Rep. No.

104-725, at 391 (1996). The House Conference Report explained that the statute was

intended to "give State and local officials the authority to communicate with the INS

regarding the presence, whereabouts, or activities of illegal aliens." *Id.* at 383; *see id.* (the

provision "is designed to prevent any State or local" prohibition or restriction on "any

communication between State and local officials and the INS").

*Murphy* expressly did not disturb the bedrock principle that state and local laws

that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." 138 S. Ct. at

1478.  As the Supreme Court admonished in *Murphy,* "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States"—even in a targeted way—but in substance merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). That is exactly what § 1373 does: it preempts States and localities from hindering the INA's regulation of aliens.  This important factor undercuts the Plaintiff's argument on this point, along with the contrary cases relied upon by the Plaintiff which did not recognize the point.  *See Oregon*, 2019 WL 3716932, at *17-19; *State of New York*, 343 F. Supp. 3d at 236; *San Francisco*, 372 F. Supp. 3d at 954; *City of Chicago*, 321 F. Supp. 3d at 872.

Plaintiff essentially asserts that it may use its regulatory authority over persons who are also subject to federal regulatory authority in a way that impedes the operation of federal law. By affirmatively asserting criminal custody over aliens whom the Federal Government seeks to detain and remove, Plaintiff's scheme impairs the exercise of the parallel federal scheme unless Plaintiff terminates custody in a manner that does not hinder the Federal Government in assuming custody. It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme.

The Federal Government is not requiring Plaintiff to enforce federal law by arresting particular individuals or extending their custody. *See Printz*, 521 U.S. at 926 (citing *New York*, 505 U.S. at 188). Instead, it is the Federal Government that seeks to assume custody, and only of those aliens whom Plaintiff has already decided, for its own

reasons, to take into custody pursuant to state criminal law. The Federal Government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority.

Moreover, even if § 1373 could properly be analyzed apart from the INA's general regulatory scheme, a requirement to not interfere with a federal inquiry about an alien's release date or other information regarding immigration status would in no sense be "commandeering" local officials to execute federal law. In *Printz*, the Supreme Court held that local law-enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law. At the same time, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918. The Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases").

### III. The Challenged Conditions Do Not Violate the Spending Clause.

#### A. Congress may Delegate Authority to Impose Spending Conditions.

In its section on the Spending Clause, Plaintiff's opening brief argues that the challenged conditions violate the Spending Clause because the "statutes governing the

Byrne JAG program do not unambiguously permit their imposition." Pl.'s Br. 45.  Here,

Plaintiff apparently misunderstands this aspect of Spending Clause analysis.  The

inquiry here is concerned with whether the conditions attached to federal spending are

themselves ambiguous or readily understandable.  Defendants explain in their opening

brief why the challenged conditions are not impermissibly ambiguous (*see* Defs.' Br. 33-

35), and Plaintiff fails to meaningfully challenge Defendants' argument on this point.

Taking Plaintiff's argument on its face, however, it is well settled that Congress

may delegate to an executive branch agency the authority to determine conditions

attached to federal grants.  *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175

n.6 (9th Cir. 2019).  To the extent the Plaintiff believes that Congress was under an

obligation to unambiguously impose the conditions itself, there is no such rule.

Congress frequently delegates discretionary authority over distribution of federal funds

in Spending Clause legislation to executive branch agencies without raising

constitutional concerns.  As the Supreme Court has held, as long as a statute makes

clear that an agency enjoys discretion to set the terms of a funding program, and the

agency specifies the criteria to permit localities to make an informed decision, no notice

concerns arise.  Spending Clause constraints operate in part to ensure that federal

funds are distributed to recipients that are able "to exercise their choice knowingly,

cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 451 U.S. 1, 17 (1981).  As demonstrated above, Congress has delegated

adequate authority to issue the conditions, which are readily understandable to

grantees.

## B. The Conditions are Sufficiently Related to the Purposes of the Byrne JAG Program.

Plaintiff compounds its error in urging that the conditions violate the rule that any conditions on spending must be reasonably related to the purpose of the expenditures, specifically that they are "unrelated to Congress's purposes in enacting Byrne JAG." Pl.'s Br. 46.  The Spending Clause does not "impos[e] an exacting standard for relatedness," but instead is satisfied as long as the conditions "bear some relationship to the purpose of the federal spending." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (quoting *New York*, 505 U.S. at 167); *see also Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("minimum rationality"). The Supreme Court "ha[s] suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are *unrelated* to the federal interest in particular national projects or programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (emphasis added; quotation marks omitted).  And in the recent *Los Angeles* opinion, the Ninth Circuit explained that notice and access conditions comparable to those imposed here met this undemanding standard when imposed on the COPS grant program, which also funds state and local law enforcement.  *City of Los Angeles*, 929 F.3d at 1176 ("[C]ooperation relating to enforcement of federal immigration law . . . meets the low bar of being germane to the federal interest in providing the funding to . . . enhance public safety." (quotation marks omitted)).

Plaintiff attacks a straw man by arguing that immigration enforcement in general is not sufficiently related to local criminal justice. *See* Pl.'s Br. 46-49.  As an initial matter, the Ninth Circuit, in *Los Angeles*, recently concluded that DOJ's determination that "illegal immigration enforcement is a public safety issue" was reasonable. *City of*

*Los Angeles*, 929 F.3d at 1182.  And in any event, the purpose of the challenged conditions is not to promote immigration enforcement generally. It is to eliminate particular impediments to immigration enforcement created by the local law enforcement departments funded by the grants.  For example, the notice and access conditions are limited to aliens whom a city or state have taken into custody based on suspected criminal conduct, and they are designed to ensure that state and local criminal law enforcement does not obstruct federal law enforcement or endanger public safety by requiring at-large arrests in the community.  Declining to fund jurisdictions that hinder the removal of actual, or at least suspected, criminals is plainly related to the criminal-justice purposes of the Byrne JAG program.  This is entirely consistent with the broad definition of "criminal justice" used by Congress in the Byrne JAG statute.  *See* 34 U.S.C. § 10251(a)(1) (defining "criminal justice" to include "activities *pertaining* to crime prevention, control, or reduction" in addition to the mere "enforcement of the criminal law.").  Thus, the Plaintiff is simply wrong to argue that the "removal of aliens is not a criminal matter" (Pl.'s Br. 49) because the expansive Byrne JAG definition of "criminal justice" encompasses efforts to reduce and prevent crime.  Those goals are directly served when criminal aliens are deported, as they are no longer present to re-offend in the future.  Plaintiff's argument and the cases it relies upon misunderstands this expansive statutory definition of "criminal justice."  *See San Francisco*, 372 F. Supp. 3d at 947-48 (citing *City of Philadelphia*, 280 F. Supp. 3d at 642) ("Immigration law has nothing to do with the enforcement of local laws.").

IV.     **The Challenged Immigration Conditions are Reasonable and Do Not Violate the Administrative Procedure Act.**

Plaintiff's various claims under the APA must also be rejected.  In the APA section in its opening brief, Plaintiff argues that the Defendants have no statutory authority to impose the challenged conditions, and as such, they are *ultra vires* under the APA.  *See* Pl.'s Br. 50.  As shown above and in their opening brief, Defendants do, in fact, have ample statutory authority to impose the conditions.  *See, e.g.*, Defs.' Br. 35.  For these reasons, the challenged conditions should not be set aside as *ultra vires*.

Next, Plaintiff argues that the challenged conditions violate the APA because they conflict with 34 U.S.C. § 10228(a).  *See* Pl.'s Br. 50-53.  Plaintiff's contention is legally wrong, however, as the Defendants previously explained in their opening brief.  *See* Defs.' Br. 35-36.  Plaintiff fails to undercut the Defendants' earlier arguments on this point.

Finally, Plaintiff spends the bulk of its APA argument focused on its "arbitrary and capricious" claim, examining various documents in the Administrative Record prepared in this case, and chiefly arguing that the Defendants did not make an adequate factual determination about the conditions' effect on crime.  *See* Pl.'s Br. 53-60.  Defendants have already rebutted this argument in their opening brief, which demonstrates that the conditions are eminently reasonable.  *See* Defs.' Br. 37-44.  Moreover, it is sufficient under the APA's requirements for reasoned decision-making that the Defendants acted to discourage a particular practice that has a deleterious effect on the Federal Government's efforts to enforce the laws and poses risks to officer safety and the community—an effect that Plaintiff does not dispute.  As one circuit court recently recognized, "DOJ reasonably concluded that working with the Federal Government to

enforce the federal immigration laws against aliens who have committed crimes or are suspected of having committed crimes makes communities safer." *City of Los Angeles*, 929 F.3d at 1182 (quotation marks and brackets omitted). In particular, the Plaintiff's actions impair federal immigration enforcement and force the Federal Government to attempt to take custody of aliens in the community—at risk to the officers involved and to public safety—rather than taking custody through an orderly process that does not subject the community to intrusion and potential harm.

Under the APA, an agency must give adequate reasons for its decision, and the Defendants have done so here.  Although a reviewing court "must not rubber-stamp administrative decisions," it also "must not substitute its judgment for that of the agency." *Alaska Oil & Gas Ass'n v Jewell*, 815 F.3d 544, 554 (9th Cir. 2016).  The fundamental problem with Plaintiff's argument, and the contrary cases upon which it relies, is that it seeks to substitute its judgment about good policy with that of the Defendants.  *See City of Philadelphia*, 280 F. Supp. 3d at 624 (disregarding a "report concluding that many jurisdiction are not complying with Section 1373" and concluding that it does not help "justify a condition requiring those jurisdictions to certify compliance with Section 1373"); *State of New York*, 343 F. Supp. 3d at 240.  The bottom-line is that the Defendants acted reasonably in promulgating the conditions, and this satisfies the APA's arbitrary-and-capricious analysis.

## V.       Plaintiff is Not Entitled to Declaratory, Mandamus, or Injunctive Relief.

In the remainder of its opening brief, Plaintiff seeks declaratory, mandamus, and injunctive relief limited to Colorado.  For the reasons set forth above and in Defendants' opening brief, Plaintiff is not entitled to any of the requested relief.  *See, e.g.*, Defs.' Br.

50-52.  But, in the event the Court believes that the Plaintiff is entitled to any relief, such relief must be limited to the Plaintiff currently before the Court, and should not go beyond the State.

## CONCLUSION

For the reasons set forth above, the Court should grant the Defendants' motion to dismiss the Plaintiff's claims challenging the conditions, or alternatively, grant Defendants' motion for summary judgment on those same claims.  The Court should also deny the Plaintiff's motion for summary judgment.

Respectfully submitted,

**JOSEPH H. HUNT**
Assistant Attorney General

**BRIGHAM J. BOWEN**
Assistant Branch Director

 /s/ *Daniel D. Mauler*
**DANIEL D. MAULER**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

Attorneys for the Defendants