# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00736-JLK

THE STATE OF COLORADO,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE, and
WILLIAM PELHAM BARR, in his official capacity as Attorney General of the
United States,

      Defendants.

---

## OPINION AND ORDER

---

Kane, J.

      This case concerns the ability of Defendant the U.S. Department of Justice ("DOJ") to attach certain immigration-related conditions to federal grant funds provided to state and local law enforcement under the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program. Plaintiff the State of Colorado ("Colorado" or "the State") received Byrne JAG funding every year from the program's inception through 2017. For the 2018 fiscal year ("FY"), however, DOJ refused to disburse these funds to Colorado after the State objected to conditions and certifications related to the enforcement of federal immigration law. Colorado filed suit, joining a host of other state and local governments that have challenged DOJ's immigration-related grant conditions as unlawful.

      Colorado's Amended Complaint charges that the FY 2018 immigration-related conditions and certifications (the "challenged conditions") on Byrne JAG grants unconstitutionally violate separation of powers principles, the Spending Clause, and the Tenth

1

Amendment, and are also unlawful for multiple reasons under the Administrative Procedure Act ("APA"). *See* Am. Compl., ECF No. 31. DOJ and Defendant Attorney General William Barr move to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56 (Defs.' Mot., ECF No. 26). Colorado, in turn, moves for summary judgment in its favor on all counts and seeks declaratory, injunctive, and mandamus relief (Pl.'s Mot., ECF No. 35).

Congress crafted the Byrne JAG program as a means of supporting local law enforcement. By imposing conditions on Byrne JAG grants for which it has no statutory authority, DOJ has exceeded the power carefully delegated to it by Congress to administer that program. For the reasons detailed below, I find the challenged conditions unlawful. Accordingly, I grant Colorado's motion and deny DOJ's motion.

## I. BACKGROUND

### A. The Byrne JAG Program

Congress enacted the Byrne JAG program in its current form through the Violence Against Women and Department of Justice Reauthorization Act of 2005. *See* Pub. L. No. 109-162, § 1111, 1119 Stat. 2960, 3094 (2006) (codified as amended at 34 U.S.C. §§ 10151-10158). The Byrne JAG program is administered through DOJ's Office of Justice Programs ("OJP"). The OJP oversees other federal law enforcement grant programs and is headed by its Assistant Attorney General, although the Attorney General has final authority over all OJP functions and grants. *See id.* §§ 10101-10102, 10110, 10141, 10151.

The purpose of the Byrne JAG program is to support state and local criminal justice efforts by providing an additional source of funding for personnel, equipment, training, and other needs. *Id.* § 10152(a)(1). Grant recipients may spend Byrne JAG funds to support criminal

justice initiatives in eight program areas: law enforcement; prosecution and court; crime prevention and education; corrections and community corrections; drug treatment and enforcement; technology; mental health; and victim and witness services. *Id.* § 10152(a)(1)(A)-(H).

Congress established a detailed statutory formula for allocating Byrne JAG funds to states and localities. "Rather than exercising its own discretion as to which jurisdictions receive grants and in what amounts, the DOJ is obliged to distribute funding pursuant to a statutory formula." *City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (citations omitted). Congress appropriates a certain amount to the Byrne JAG program annually, and under the formula, that appropriation is divided among states based on population and violent crime statistics. 34 U.S.C. § 10156. A state or local government must apply annually to DOJ to receive its share of funding. *Id.* § 10153(a).[1] Up to sixty percent of a state's allocation goes to the state government, and no less than forty percent goes to local governments within the state. *See id.* § 10156(b)-(c). Once awarded its statutory share of funds, a state may also make subawards to local governments and community organizations, which act as subgrantees. *Id.* § 10152(b).

Although Byrne JAG funds must be allocated according to the statutory formula, DOJ retains some discretion to reserve and redistribute certain funds. *See id.* §§ 10156(f), 101057. For example, DOJ may reserve up to $20 million of Congress's annual appropriation to assist local law enforcement in modernizing technology and another $20 million to fund antiterrorism training programs. *Id.* § 10157(a). DOJ may also reserve up to five percent of the annual

---

[1] The original statutory text numbered this subsection as "(A)", but it is widely recognized that this should probably be "(a)". *See* 34 U.S.C. § 10153 n. 1; *see, e.g.*, *City of Providence*, 954 F.3d at 28 (citing the subsection as § 10153(a)). I will refer to the subsection as § 10153(a) throughout this Opinion and Order.

appropriation for grants to address "precipitous or extraordinary increases in crime" or "significant programmatic harm resulting from operation of the formula." *Id.* § 10157(b).

The Attorney General has limited authority to monitor and review program and financial information as well. For example, programs receiving Byrne JAG funds must have an "assessment component, developed pursuant to guidelines established by the Attorney General . . . ." *Id.* § 10152(c). In addition, grant recipients must "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require[,]" *id.* § 10153(a)(4), and certify that Byrne JAG funds "will not be used to supplant State or local funds." *Id.* § 10153(a)(1).

DOJ has historically required Byrne JAG applicants to accept and satisfy a number of "special conditions," which largely relate to the recipient's administration of the grant. *See City of Philadelphia v. Attorney Gen. of the U.S.*, 916 F.3d 276, 280 (3d Cir. 2019) ("Historically, the OJP has included a number of conditions on the application . . ., most of which relate to program integrity or impose requirements for the handling of federal funds."); *see also* 34 U.S.C. § 10153(a). Some conditions "require that recipients that use their funding for certain purposes (including purchasing police equipment and developing training materials) adhere to federal guidelines[,]" and recipients must meet federal information technology, financial management, and nondiscrimination requirements. *City of Providence*, 954 F.3d at 28.

**B. DOJ's Immigration-Related Goals and the Challenged Conditions**

The challenged conditions were spurred by the Attorney General's determination that state and local policies and practices of withholding cooperation from federal immigration authorities were frustrating the federal government's immigration goals. *See* Backgrounder on Grant Requirements, AR 00993, ECF No. 25-15. In 2017, the Attorney General announced that

DOJ would award Byrne JAG grants only to jurisdictions that share certain immigration-related information with federal immigration agencies, allow access to local detention facilities, and provide notice before releasing certain aliens as requested by the U.S. Department of Homeland Security ("DHS"). *See* July 25, 2017 DOJ Press Release, AR 00992, ECF No. 25-15. DOJ has continued to impose these and other immigration-related conditions on the receipt of Byrne JAG funding.

For FY 2018 Byrne JAG grants, DOJ imposed the following "special conditions" related to federal immigration enforcement:

- **Notice Condition:** The recipient (in this case, Colorado) and its subgrantees must provide 48 hours' "advance notice," or as much advance notice as is "practicable," of the "scheduled release date and time" of any alien in the jurisdiction's custody if the jurisdiction receives a "formal written request" from DHS. Grant Award Special Conditions ¶ 46, at 21, ECF No. 35-4. This condition incorporates 8 U.S.C. §§ 1226, 1231, and 1366, which relate to the powers and duties of federal immigration authorities. The recipient is required to monitor its subgrantees' compliance with this condition.

- **Access Condition:** The recipient and its subgrantees are prohibited from "impeding access to any State or local government . . . correctional facility by [federal] agents for the purpose [of] interrogating any alien or person believed to be an alien as to his or her right to be or to remain in the United States." Grant Award Special Conditions ¶ 45, at 20. This condition incorporates 8 U.S.C. § 1357(a), under which certain federal immigration authorities have the power to interrogate illegal aliens or persons

believed to be illegal aliens. The recipient is required to monitor its subgrantees' compliance with this condition.

- **Compliance Condition:** Each Byrne JAG applicant must comply with 8 U.S.C. §§ 1373 and 1644. Grant Award Special Conditions ¶¶ 41-42, at 16-17. These statutes prohibit state and local government entities from restricting communications with federal immigration authorities regarding citizenship or immigration status.[2] The recipient must monitor itself and its subgrantees for compliance with this condition and certify that there are no restrictions on information-sharing about the citizenship or immigration status of any individuals. This is also referred to as the "certification" condition by some courts.

- **Harboring Condition:** This condition prohibits public disclosure of "federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice . . . or any alien who has come to, entered, or remains in the United States" in violation of federal law. Grant Award Special Conditions ¶ 44, at 19; *see also City & Cty. of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 938-39 (N.D. Cal. 2019). This condition incorporates 8 U.S.C. § 1324, which imposes criminal penalties for concealing, harboring, or shielding from detection illegal aliens. 8 U.S.C. § 1324(a). This is also referred to as the "disclosure" condition by some courts.

---

[2] Section 1373 provides that no "State[ ] or local government entity or official may . . . prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). Section 1644 similarly prohibits State or local government entities from restricting communications with federal immigration authorities regarding the lawful or unlawful immigration status "of an alien in the United States." *Id.* § 1644.

- **Questionnaire Condition:** This condition requires each applicant for Byrne JAG funds to describe any of its laws, policies, or practices that relate to communication with federal immigration authorities and to provide an explanation of how those laws, policies, or practices comply with 8 U.S.C. § 1373. FY 2018 State Solicitation at 27-28, ECF No. 35-2.[3] The recipient may not make a subaward unless it obtains responses from proposed subgrantees and retains the information for review by DOJ. Grant Award Special Conditions ¶ 47, at 22.

- **Additional Certification Requirement:** This condition requires the recipient to certify compliance with additional federal immigration statutes derived from the Immigration and Nationality Act, including 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3). *See* FY 2018 Certifications and Assurances at 41-45, ECF No. 35-3. This condition incorporates a requirement that the jurisdiction's chief legal officer certify, under penalty of perjury, that neither it nor any of its subgrantees has any policy, law, or practice in effect that would impede federal officers' exercise of authority under the listed immigration-related statutes, or aid or abet the harboring or shielding from detection any illegal alien. *Id.* at 45.[4] An

---

[3] Each applicant must answer the following: (1) whether the jurisdiction has "any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or [Immigration and Customs Enforcement ("ICE")]"; and (2) whether the jurisdiction is "subject to any laws from a superior political entity" that relate to whether, when, or how employees may communicate with DHS or ICE. *Id.* at 27. If the answer to either question is "yes," the applicant must provide a copy of the policy or law, describe each practice, and "explain how the law, policy, or practice complies with section 1373." *Id.* at 27-28.

[4] Specifically, each state or local government applicant must certify that neither it nor any subgrantee receiving funds has "any law, rule, policy, or practice" that would or does "violate, or aid or abet any violation of" 8 U.S.C. § 1324(a), or "impede the exercise by federal officers of authority" relating to 8 U.S.C. §§ 1226(a) & (c), 1357(a), or 1366(1) & (3). FY 2018 Certifications and Assurances at 45. Section 1324(a) makes it a crime to conceal, harbor, or shield from detection any person present in the United States in violation of law. 8 U.S.C. §

applicant that makes a materially false, fictitious, or fraudulent statement in the required certifications may be subject to criminal prosecution, civil penalties, and/or administrative remedies. *See id.* at 41-45; Thome Aff. ¶ 10, ECF No. 35-1.

### C. Colorado's FY 2018 Award and Resulting Lawsuit

Colorado has applied for and received Byrne JAG funding every year from 2005 through 2017, with annual grants ranging from $1.5 to $4.7 million. Thome Aff. ¶ 4. Colorado applied for a FY 2018 Byrne JAG grant and expected to receive more than $2.7 million based on the statutory formula. DOJ initially approved an award of $2,796,761, subject to Colorado's acceptance of the grant's special conditions and required certifications. *Id.* ¶¶ 8-10. In October 2018, Colorado accepted the grant with the caveat that it objected to the immigration-related conditions and certifications as unlawful and unenforceable. *Id.* ¶ 12. In early 2019, DOJ advised Colorado that it would not receive its FY 2018 grant unless it rescinded its objections. *Id.* ¶ 14. Colorado has not changed its position and so has not received its FY 2018 award. *Id.* ¶¶ 16-18.

Colorado determined that it could not certify compliance with the immigration-related conditions because it lacks the authority to force local entities to meet the conditions and has neither the funding nor the personnel needed to monitor local entities as the conditions require. *Id.* ¶ 11(a). In addition, Colorado was concerned that compliance with the immigration-related

---

1324(a)(1)(A)(iii). Section 1357(a) describes the authority of an immigration officer to "interrogate any alien," "arrest any alien," or exercise other proscribed powers without a warrant. *Id.* § 1357(a). Sections 1226, 1231, and 1366 involve the powers of immigration officers to arrest, detain, release, and remove undocumented persons, and to make annual reports on certain "criminal alien" statistics. *Id.* §§ 1226(a), (c) (authorizing arrest and detention of certain aliens and providing that the federal government shall take certain criminal aliens into custody when they are released); 1231(a)(4) (providing that the federal government may not remove an alien who is sentenced to imprisonment until the alien is released; 1366(1), (3) (requiring the Attorney General to submit an annual report to Congress detailing the number of illegal aliens incarcerated for the commission of felonies).

conditions would irreversibly diminish immigrant communities' trust in law enforcement and make members of these communities less likely to report crimes and cooperate with law enforcement. *Id.* ¶ 11(b). Colorado maintains that DOJ's withholding of its FY 2018 Byrne JAG grant has left state and local law enforcement without crucial funding that would have been used to purchase equipment, hire personnel, improve rehabilitation programs, increase community policing efforts, and create innovative criminal justice programs. *Id.* ¶ 18.

Colorado brought this lawsuit on March 12, 2019, after DOJ again refused to approve the FY 2018 award unless Colorado rescinded its objections to the challenged conditions. Colorado claims that DOJ is without statutory authority to impose immigration-related conditions on Byrne JAG grants. Colorado also challenges the constitutionality of 8 U.S.C. §§ 1373 and 1644 as applied to states and local governments. To remedy its injuries, Colorado requests that I: (1) declare the challenged conditions unlawful; (2) declare §§ 1373 and 1644 unconstitutional; (3) issue a permanent injunction preventing DOJ from imposing the challenged conditions on Colorado and its subgrantees; and (4) issue a writ of mandamus compelling DOJ to issue Colorado's FY 2018 Byrne JAG award without the challenged conditions and to disburse the funds immediately. *See* Pl.'s Mot. at 69.

### D. Related Litigation

DOJ first imposed the notice and access conditions, as well as the compliance condition related to 8 U.S.C. § 1373, for the FY 2017 Byrne JAG grants. As described above, for FY 2018, DOJ expanded the compliance condition to include 8 U.S.C. § 1644, which is functionally equivalent to § 1373, and added the harboring condition, the questionnaire condition, and the certification requirement relating to additional federal immigration statutes (i.e., 8 U.S.C. §§

1226, 1231, 1324, 1357, and 1366). Several jurisdictions sued to enjoin enforcement of the

immigration-related conditions imposed for the FY 2017 and FY 2018 grants.

Every district court that has examined the issue, as well as the First, Third, and Seventh

Circuits, has rejected DOJ's argument that it is statutorily authorized to impose the notice and

access conditions. *See City of Providence*, 954 F.3d at 27 (concluding that DOJ lacked statutory

authority to impose the notice, access, and compliance conditions), *aff'g* 385 F. Supp. 3d 160

(D.R.I. 2019); *City of Philadelphia v. Attorney Gen. of the U.S.*, 916 F.3d 276, 291 (3d Cir.

2019) (same), *aff'g in part and vacating in part City of Philadelphia v. Sessions*, 309 F. Supp. 3d

271 (E.D. Pa. 2018); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir. 2018) ("[T]he

district court did not err in determining that the City established a likelihood of success on the

merits of its contention that the Attorney General lacked the authority to impose the notice and

access conditions on receipt of the Byrne JAG grants."), *reh'g en banc granted in part, opinion

vacated in part*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (granting *en banc*

review as to the single issue of whether a nationwide injunction was proper); *Oregon v. Trump*,

406 F. Supp. 3d 940, 963 (D. Or. 2019) (holding DOJ did not have statutory authority to impose

the notice and access conditions), *appeal docketed* No. 19-35843 (9th Cir. Oct. 4, 2019); *City &

Cty. of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 941 (N.D. Cal. 2019) (holding that the

FY 2018 notice and access conditions violate separation of powers); *States of New York v. U.S.

Dep't of Justice*, 343 F. Supp. 3d 213, 245 (S.D.N.Y. 2018) (holding that the FY 2017 notice,

access, and compliance conditions violate separation of powers), *rev'd sub nom. State of New

York  v. U.S. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020); *City & Cty. of San Francisco v.

Sessions*, 349 F. Supp. 3d 924, 945-48 (N.D. Cal. 2018) (considering challenges to the FY 2017

grant conditions and holding DOJ lacked the authority to impose the notice and access

conditions), *appeal docketed sub nom. City & Cty. of San Francisco v. Whitaker*, No. 18-17308 (9th Cir. Dec. 4, 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 874 (N.D. Ill. 2018) (finding DOJ failed to demonstrate it had statutory authority to impose the notice and access conditions); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 617 (E.D. Pa. 2017) (finding that DOJ's asserted statutory authority was not intended to confer authority to impose the challenged conditions) (subsequent history omitted). Recently, however, the Second Circuit reversed the Southern District of New York and became the first, and to date the only, court to conclude that the Attorney General has statutory authority to impose the notice and access conditions. *State of New York*, 951 F.3d at 90.

Additionally, several district courts have held that 8 U.S.C. §§ 1373 and 1644, and the conditions and certifications based thereon, violate the Tenth Amendment. *See City of Evanston v. Barr*, 412 F. Supp. 3d 873, 889 (N.D. Ill. 2019) (holding that §§ 1373 and 1644 violate the Tenth Amendment's anticommandeering doctrine); *City of Chicago v. Barr*, 405 F. Supp. 3d 748, 763 (N.D. Ill. 2019) (same); *Oregon*, 406 F. Supp. 3d at 973 (holding §§ 1373 and 1644 facially unconstitutional and unenforceable against state and city plaintiffs); *City of Los Angeles v. Sessions*, No. CV 18-7347-R, 2019 WL 1957966, at *4 (C.D. Cal. Feb. 15, 2019) (finding §§ 1373 and 1644 "unconstitutional as applied" to state and local governments under the Tenth Amendment); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 949-53 (considering the policy reasons behind the anticommandeering principle and finding § 1373 unconstitutional); *City of Chicago*, 321 F. Supp. 3d at 872 (concluding that § 1373 "impermissibly directs the functioning of local government in contravention of Tenth Amendment principles" and is "unconstitutional on its face").

The few courts that have considered the more recent FY 2018 harboring and questionnaire conditions and additional immigration-related certifications have similarly found DOJ's authority lacking. *See City of Evanston*, 412 F. Supp. 3d at 886 ("[T]he Attorney General lacks statutory authority to impose the questionnaire condition, and it is *ultra vires*."); *City of Chicago*, 405 F. Supp. 3d at 764-67 (finding the FY 2018 harboring condition and additional certification requirement *ultra vires*); *Oregon*, 406 F. Supp. 3d at 970 (concluding that the Attorney General is without the delegated authority to impose the harboring, or "disclosure," condition); *City & Cty. of San Francisco*, 372 F. Supp. 3d at 947 (holding that because "Congress has not granted the DOJ the power to impose the [harboring] or [questionnaire] conditions[,]" the conditions are *ultra vires* and violate the separation of powers); *City of Los Angeles*, 2019 WL 1957966, at *5 (finding DOJ's imposition of the harboring, questionnaire, and certification conditions to be *ultra vires* and a violation of separation of powers).

As is appropriate, I am benefitted by the analyses of courts that have considered claims similar to those before me.

## II. STANDARDS OF REVIEW

### A. Dismissal Under Rule 12(b)(6)

For Colorado's claims to survive DOJ's Motion to Dismiss under Rule 12(b)(6), each must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Instead, it requires simply a nudge beyond "conceivable." *Id.* My role in reviewing "a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's . . . complaint alone is legally sufficient to state a claim for which relief may be granted." *Peterson v.*

*Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). As explained throughout this Opinion, Colorado has more than sufficiently stated its claims for relief to survive dismissal under Rule 12(b)(6).

### B. Summary Judgment Under Rule 56(a)

Colorado moves for summary judgment on all of its claims, and DOJ moves to dismiss or, in the alternative, for summary judgment. Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* Where both parties have moved for summary judgment, the court may "assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981). Here, the parties' cross motions for summary judgment have revealed no genuine disputes of material facts, and judgment as a matter of law is appropriate.

### III. DISCUSSION

The legal questions raised by the parties' motions are (1) whether the challenged conditions violate the separation of powers doctrine by exceeding the authority Congress delegated to DOJ; (2) whether the challenged conditions violate the Constitution's Spending Clause; (3) whether 8 U.S.C. §§ 1373 and 1644 violate the Tenth Amendment's anticommandeering doctrine; and (4) whether the challenged conditions are unlawful under the APA. I work my way through them in that order, beginning with DOJ's most obvious violation: exceeding the scope of its delegated authority.

### A. Separation of Powers and Statutory Authority for the Challenged Conditions

The executive branch's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585. "Where, as here, the [e]xecutive [b]ranch is not acting pursuant to a constitutional power, it 'literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Philadelphia*, 916 F.3d at 284 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).[5] "[F]or agencies charged with administering congressional statutes[,] [b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, . . . what they do is *ultra vires*." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (italics added).

Colorado asserts that Congress has not delegated authority to impose immigration-related conditions on Byrne JAG funds, and that by imposing unauthorized conditions on congressionally appropriated funds, DOJ unlawfully usurped congressional power in violation of the separation of powers doctrine. DOJ counters that Congress has delegated sufficient authority to DOJ to impose these conditions "in order to promote inter-governmental law enforcement cooperation." Defs.' Mot. at 23. This authority, DOJ argues, is conferred in the Byrne JAG program statute and the statute detailing the OJP's duties and functions. DOJ maintains that each statute provides an independent basis for imposing the conditions. DOJ is wrong; neither statute grants it the authority to impose the challenged immigration-related conditions.

---

[5] The Constitution grants to Congress, and Congress alone, the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. It does not give the executive any independent authority to spend or withhold federal funds that Congress has appropriated. *See, e.g.*, *City of Chicago*, 405 F. Supp. 3d at 763 ("If the [executive branch] has spending power, it is because Congress delegated that authority.").

### 1. Byrne JAG Statute

The Byrne JAG program is a formula grant program, meaning that Congress has already "determine[d] who the [grant] recipients are and how much money each shall receive." *Oregon*, 406 F. Supp. 3d at 963 (quoting *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989)) (alterations in original). DOJ is correct that the formula nature of the Byrne JAG program does not necessarily preclude it from conditioning funds, and Colorado acknowledges that DOJ has limited authority to impose grant conditions consistent with the authority delegated by Congress. *See* Pl.'s Mot. at 27-29. The question, then, is "to what extent Congress granted DOJ, and the Assistant Attorney General heading OJP, the power to impose its own conditions on Byrne JAG grants." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 945.

Reviewing the text of the Byrne JAG statute, no provision in the statute expressly authorizes the Attorney General to impose the challenged conditions. *See generally* 34 U.S.C. §§ 10151-10158; *see also City of Philadelphia*, 916 F.3d at 284 ("Such authorization is nowhere to be found in the text of the statute."); *Oregon*, 406 F. Supp. 3d at 963-64 ("[O]n its face, the statute indisputably does not authorize the Attorney General to place conditions on the recipients of Byrne JAG funds or withhold funds allocated under the statutory formula."); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 947 ("[N]othing in the Byrne JAG statute grants express authority . . . to impose the notice and access conditions.") (internal quotation marks and citation omitted).

In the absence of such express authorization, DOJ looks for its authority in the provisions of the Byrne JAG statute that require applicants to report information, coordinate with other agencies, and comply with "all other applicable Federal laws." 34 U.S.C. §§ 10153(a)(4), (a)(5)(C), (a)(5)(D).

### a. Information-Reporting and Coordination Provisions

DOJ first maintains that its power to impose the notice and access conditions (and related certifications) flows from § 10153(a), which requires Byrne JAG applications to include both "[a]n assurance that . . . the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require" and "[a] certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant . . ., that . . . there has been appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (a)(5)(C). With respect to the § 10153(a)(4) assurance, DOJ construes "programmatic" information to include all "law enforcement" and "corrections" programs, and it contends that notice of an alien's release from local custody is reasonable information about law enforcement and corrections programs funded by the grants. As for the certification in § 10153(a)(5)(C), DOJ insists that access to an alien in local custody constitutes "appropriate coordination" with federal immigration authorities.

This theory is unpersuasive. First, DOJ's interpretation of § 10153(a)(4) ignores that the "programmatic and financial" qualification on the information grantees may be required to provide is clearly meant as a limitation. As other courts have determined, § 10153(a)(4) authorizes the Attorney General to require applicants to maintain and provide information about Byrne JAG funded programs, i.e. "programmatic" information, but it does not extend his domain so far as to encompass information unrelated to programs funded by the grant. *See City of Philadelphia*, 916 F.3d at 285 ("The data-reporting requirement is expressly limited to . . . information regarding the handling of federal funds and the programs to which those funds are directed. It does not cover Department priorities unrelated to the grant program."); *City of Evanston*, 412 F. Supp. 3d at 885 ("The Court interprets 'programmatic' to mean information

related to the program to be funded by the JAG grant. That is how this term is used elsewhere within § 10153 and in other sections of the Byrne JAG statute."); *Oregon*, 406 F. Supp. 3d at 964 ("The provision is not . . . a general information-sharing requirement and its terms are not broad enough to cover information unrelated to programs funded by the grant."). Moreover, the provision requires an applicant to report such information "for each fiscal year covered by an application." 34 U.S.C. § 10153(a)(4). "The fact that the statute ties the reporting obligation to the years 'covered by an application' supports interpreting the term 'programmatic' to refer to Byrne JAG itself and the specific activities that a grant funds." *City of Providence*, 954 F.3d at 33.

Second, it would be unreasonable to interpret § 10153(a)(5)(C), which contains certifications required in Byrne JAG *applications*, to impose an ongoing obligation to coordinate with uninvolved players on matters unrelated to an applicant's use of grant funds. Indeed, "the coordination requirement only makes sense if it applies to a jurisdiction's coordination with agencies who will participate" in programs funded by a Byrne JAG award. *Oregon*, 406 F. Supp. 3d at 964. The use of the past tense—"[a] certification that . . . there *has been* appropriate coordination with affected agencies," 34 U.S.C. § 10153(a)(5)(C) (emphasis added)—supports the understanding that the provision only requires certification that the applicant *had* coordinated with affected agencies before submitting the grant application, not that the applicant will continuously coordinate with immigration authorities to provide access to aliens in custody. *See City of Providence*, 954 F.3d at 33 ("That tense makes pellucid that the coordination to which the statute alludes must take place <u>before</u> a state or local government submits its application."); *City of Philadelphia*, 916 F.3d at 285 ("[W]e interpret [the coordination requirement] to require certification that there *was* appropriate coordination in connection with the grantee's application.

This does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds.").

Finally, the statutory context does not support DOJ's expansive reading of the information-reporting and coordination provisions, which are found among a list of required assurances related to the *application* and the *programs to be funded* by the Byrne JAG grant. *See* 34 U.S.C. § 10153(a). It logically follows that Congress intended these requirements to relate to the annual application and administration of the grant—not to bestow upon DOJ the far-reaching authority to further its own priorities by mandating reporting and coordination unrelated to the programs to be funded by the grant. *See City of Providence*, 954 F.3d at 34 ("The broad authorization that the DOJ purports to find in these provisions—the power to condition a Byrne JAG grant on the recipient's reporting of information and coordination on matters relating to any of the far-flung law enforcement operations that it conducts—is implausible in this context.").

### b. "Applicable Federal Laws" Provision

DOJ next argues that the challenged immigration-related conditions and certifications are authorized by § 10153(a)(5)(D), which requires the applicant to certify that it "will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). *See* Defs.' Reply 22-23, ECF No. 39. DOJ asserts that the "all other applicable Federal laws" clause authorizes it to condition Byrne JAG funds on compliance with any federal law, including 8 U.S.C. §§ 1373 and 1644 and additional federal immigration statutes. Colorado offers a narrower interpretation, limiting "applicable laws" to those that expressly apply to federal grants. *See* Pl.'s Mot. at 30-31.

As several courts have recognized, both meanings are plausible. *See City & Cty. of San Francisco*, 372 F. Supp. 3d at 946; *City of Chicago*, 264 F. Supp. 3d 933, 944 (N.D. Ill. 2017);

*City of Philadelphia*, 280 F. Supp. 3d at 619. While the Northern District of Illinois found the language to unambiguously indicate "a broad reading in line with the Attorney General's interpretation[,]" *City of Chicago*, 321 F. Supp. 3d at 875, other courts have adopted the narrower interpretation offered by Colorado.

In determining that 8 U.S.C. § 1373 is not an applicable law for the purposes of Byrne JAG, both the First and Third Circuits employed the canon against surplusage and reasoned that the term "applicable" must be given some independent effect because Congress did not simply write that the applicant must certify compliance with "all other Federal laws." *City of Providence*, 954 F.3d at 37 ("[T]he fact that Congress included the word 'applicable' strongly implies that the provision must refer to a subset of all federal laws that apply to state and local governments.") (citation omitted); *City of Philadelphia*, 916 F.3d at 289 ("Thus, the word 'applicable' must have a narrower meaning than one that sweeps in all possible laws that independently apply to a grant applicant.").

Those courts also considered the principle of *noscitur a sociis*—"a word is known by the company it keeps"—and reasoned that the "applicable Federal laws" provision must be given related meaning to the neighboring assurances and certifications in § 10153(a), which all concern the Byrne JAG application and the programs to be funded by the grant. *City of Providence*, 954 F.3d at 37; *City of Philadelphia*, 916 F.3d at 288-90. As the Third Circuit explained, "it would be reasonable to view 'all other applicable Federal laws' to refer specifically to laws that apply to operations relating to the grant, not to require the [recipient] to certify compliance with every single law that might apply to it." *City of Philadelphia*, 916 F.3d at 289-90. The First Circuit similarly concluded that "[i]n this statutory setting, the phrase 'all other applicable Federal laws' logically denotes laws that apply to states and localities <u>in their capacities as Byrne JAG grant</u>

recipients." *City of Providence*, 954 F.3d at 37. *See also City & Cty. of San Francisco*, 349 F. Supp. 3d at 954 ("The statutory structure suggests 'applicable' was intended to refer to laws related to grant applications.").

I agree with the reasoning of the First and Third Circuits. The immigration statutes incorporated into the challenged conditions and certifications are far too broad and removed from the programs to be funded by Colorado's Byrne JAG grant to constitute "applicable" laws in this context.

In contrast, the Second Circuit adopted an interpretation of § 10153(a)(5)(D) that, in my view, is incorrect as it reaches far too broadly. In holding that § 10153(a)(5)(D) authorizes DOJ to condition a locality's receipt of Byrne JAG funds "on its certified willingness to comply with *all* federal laws *applicable* to that locality," the court found "something disquieting in the idea of States and localities seeking federal funds to enforce their own laws while themselves hampering the enforcement of federal laws, or worse, violating those laws." *State of New York*, 951 F.3d at 107. This reasoning ignores the difference between actively thwarting federal law enforcement and taking a passive approach to federal immigration enforcement. Furthermore, the court places undue reliance on federal immigration policy arguments in order to contrive a connection between § 1373 and the Byrne JAG program that was not envisioned by Congress.[6]

If Congress wanted § 1373 to be imposed as a condition on Byrne JAG funding, or intended to give DOJ broad discretionary authority to impose similar conditions for Byrne JAG

---

[6] Notwithstanding my unwavering respect for the Second Circuit, I find the court's emphasis on the legislative history of immigration laws and § 1373 concerning in this context. Statements made by some members of Congress during the enactment of § 1373 cannot be woven into a carpet of Congressional intent to condition Byrne JAG grants on compliance with all federal laws, or § 1373 in particular. *See State of New York*, 951 F.3d at 96-97 (discussing the legislative history of § 1373).

grants, it surely would have said so. Indeed, Congress took care to identify instances where DOJ could deviate from the statutory formula and withhold funds from recipients that fail to comply with certain federal law enforcement requirements.[7] "[T]he express authorization for specific deviations from the formula strongly implies that Congress did not intend to give the DOJ the power to advance its own priorities by means of grant conditions." *City of Providence*, 954 F.3d at 35 (citing *City of Philadelphia*, 916 F.3d at 286, and *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) (declining to find broad agency authority in statute that specifically describes limits on agency's authority to act)).

Thus, as concluded by the First and Third Circuits, the immigration-related statutes incorporated into the challenged conditions and certifications are not "applicable Federal laws" within the meaning of 34 U.S.C. § 10153(a)(5)(D).

### 2. Statute on Duties and Functions of OJP Assistant Attorney General

Located in a separate subchapter than the Byrne JAG statute, 34 U.S.C. § 10102 delineates the duties and functions of the OJP Assistant Attorney General. It provides, in relevant part, that the Assistant Attorney General shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants.*" 34 U.S.C. § 10102(a)(6) (emphasis added). DOJ contends that the

---

[7] *See* 34 U.S.C. § 40914(b) (authorizing or requiring the Attorney General to withhold a specified percentage of the amount that would otherwise be allocated under Byrne JAG if a state fails to meet certain requirements of the National Instant Criminal Background Check System); *id.* § 60105(c)(2) (authorizing the Attorney General to withhold up to 10 percent of Byrne JAG funds if a state fails to comply with "death-in-custody" reporting requirements); *id.* § 20927(a) (mandating a ten percent reduction in Byrne JAG funds for failure to comply with the Sex Offender Registration and Notification Act); *id.* § 30307(e)(2) (mandating a five percent reduction in Byrne JAG funds for failure to comply with the Prison Rape Elimination Act).

italicized language authorizes it to condition the award of formula grants "on state and local cooperation with federal authorities in achieving federal law enforcement priorities, including the removal of criminal aliens." Defs.' Mot. at 26.

DOJ's interpretation is not supported by the text or structure of § 10102(a)(6). In this provision, the plain meaning of the word "including" is to "set forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General." *City of Chicago*, 888 F.3d at 285. "This means that the Assistant Attorney General 'has the power to place special conditions on grants *only* to the extent such power has been vested in him or her' elsewhere in the chapter or by delegation of the Attorney General." *Oregon*, 406 F. Supp. 3d at 966 (quoting *City of Philadelphia*, 916 F.3d at 287). As discussed above, the authority to impose the challenged conditions is not provided in the Byrne JAG statute.[8]

In addition, at least two courts have found that the term "special conditions" is a term of art referring to conditions for high-risk grantees with difficulty adhering to grant requirements and cannot be read to authorize the imposition of *any* conditions generally. *See Oregon*, 406 F. Supp. 3d at 966 ("[W]hen Congress enacted the current version of [§] 10102(a)(6), [DOJ's] own regulations described 'special conditions' as those intended for 'high-risk grantees' who might struggle to meet existing grant requirements."); *City of Philadelphia*, 280 F. Supp. 3d at 617.

The structure of § 10102(a) further belies DOJ's interpretation. The remaining paragraphs in that subsection address the information-reporting and coordination duties of the Assistant

---

[8] While the Second Circuit found that other statutory provisions grant DOJ the authority to impose the challenged conditions, it agreed that § 10102(a)(6) does not itself authorize the conditions. *State of New York*, 951 F.3d at 101-02.

Attorney General. *See* 34 U.S.C. § 10102(a)(1)-(5). As courts have observed, Congress is unlikely to place the immense authority to impose any substantive conditions on grants in a subsection that exclusively confers communication and coordination powers and duties on the Assistant Attorney General. *See City of Chicago*, 888 F.3d at 285 ("A clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General."); *Oregon*, 406 F. Supp. 3d at 966 ("A final catch-all provision in a list of ministerial powers would be a strange place indeed for Congress to hide the broad authority claimed by Defendants."); *City of Philadelphia*, 280 F. Supp. 3d at 617 ("Congress is unlikely to ground the Attorney General's authority to impose substantive conditions in a subsection dedicated to conferring power on the [Assistant Attorney General]."). "[H]iding such a broad power . . . in a statute outlining ministerial duties for an Assistant Attorney General would be akin to hiding an elephant in a mousehole. And Congress 'does not, one might say, hide elephants in mouseholes.'" *City of Philadelphia*, 916 F.3d at 288 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

Nevertheless, DOJ insists that because Congress added the "special conditions" and "priority purposes" language as part of a statutory amendment, it intended "to confer distinctive and meaningful power on the [Assistant Attorney General] to impose grant conditions." Defs.' Mot. at 24. DOJ's unbounded interpretation of § 10102(a)(6) defies reason. It is implausible that Congress would have provided to the Assistant Attorney General "such sweeping authority over the major source of funding for law enforcement agencies nationwide . . . by merely adding a clause to a sentence in a list of otherwise-ministerial powers . . . ." *City of Chicago*, 888 F.3d at

287. As the First Circuit concluded, "[i]f Congress meant to give the Assistant [Attorney General] the wide-ranging discretionary authority envisioned by the DOJ, . . . it would have done so in clearer terms and in a more prominent place in the statute." *City of Providence*, 954 F.3d at 41.[9]

Moreover, DOJ's reading of § 10102(a)(6) "would render entire swaths of the Byrne JAG statute—the actual statute at issue here—unnecessary surplusage." *Oregon*, 406 F. Supp. 3d at 967. Congress has carefully specified the circumstances in which the Attorney General may, or must, withhold Byrne JAG funds for a grantee's failure to comply with certain federal laws. *See supra*, note 7. "If Congress had already given the Attorney General th[e] sweeping authority to withhold all funds for any reason, it would have no need to delineate numerous, specific circumstances under which the Attorney General may withhold limited amounts of funds." *City of Philadelphia*, 916 F.3d at 286.

In ruling that DOJ lacked the authority to impose the harboring condition, for example, the District Court for the District of Oregon explained:

---

[9] In passing, DOJ also cites § 10102(a)(2) to support its contention that the challenged conditions are reasonable and do not violate the APA. *See* Defs.' Mot. at 39. Section 10102(a)(2) requires the Assistant Attorney General to "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2). However, courts have rejected the argument that the "liaison" duty confers authority to impose any of the challenged conditions. *See City of Evanston*, 412 F. Supp. 3d at 883 (rejecting the argument that § 10102(a)(2) provides authority to impose the questionnaire condition); *City & Cty. of San Francisco*, 372 F. Supp. 3d at 945 ("There is no authority in Section 10102 for the DOJ to impose the [harboring or questionnaire] conditions based on its authority to place 'special conditions' on grants or its duty to 'maintain liaison' in criminal justice matters."); *City of Chicago*, 405 F. Supp. 3d at 766  ("[T]he structure and design of the statute as a whole does not support the contention that 'maintain liaison' provides authority for the Attorney General to impose the harboring condition."); *Oregon*, 406 F. Supp. 3d at 969-70 (rejecting defendants' interpretation of § 10102(a)(2) and finding that DOJ was without the delegated authority to impose the harboring condition). I agree with these courts and find that § 10102(a)(2) does not authorize the imposition of the challenged conditions.

> When Congress wanted grantees to engage in or refrain from certain types of conduct—even information sharing—it provided for specific and measured penalties. *See, e.g.*, 34 U.S.C. § 40914(b)(1) (imposing up to a four-percent penalty if a grantee abstains from the National Instant Criminal Background Check System); *id.* § 60105(c)(2) (imposing up to a ten-percent penalty if a grantee fails to report the number of persons who die in state and local custody). If Congress had shared the same concerns about grantees disclosing immigration-related information, it could have enacted analogous penalties. But it did not.

*Oregon*, 406 F. Supp. 3d at 970. Thus, the structure of the statute as a whole does not support the contention that § 10102(a)(6) gives the Assistant Attorney General, through the Attorney General, the broad authority to attach any special conditions to any grants it administers even when that authority is not otherwise provided in the chapter.

Finally, I emphasize that Congress has considered and rejected statutory amendments that would place immigration-related conditions on Byrne JAG funds. "'Congress has repeatedly, and frequently, declined to broadly condition federal funds or grants on compliance with [§] 1373 or other federal immigration laws,' as DOJ is now attempting to do with the challenged conditions." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 959 (quoting *Cty. of Santa Clara*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017)). More to the point, on at least two occasions over the last five years, Congress failed to enact introduced bills that were specifically intended to deny Byrne JAG funding to jurisdictions that violated 8 U.S.C. § 1373 or failed to comply with detainers issued under 8 U.S.C. §§ 1226 and 1357.[10] While failed legislation is not dispositive of the matter, it undermines DOJ's position. Had Congress already delegated the substantial authority

---

[10] *See* Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015) (providing that any state or political subdivision that does not come into compliance with 8 U.S.C. § 1373 or comply with a detainer issued under 8 U.S.C. §§ 1226 and 1357 after receiving notice of its noncompliance is not eligible to receive a Byrne JAG grant); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015) (providing that if a state or local government that received a Byrne JAG grant during a fiscal year is found to have violated § 1373, "the Attorney General shall withhold all of the amount that would otherwise be awarded" to it for the following fiscal year).

claimed by DOJ, there would be no need to consider bills that would expressly impose similar immigration-related conditions on Byrne JAG funding.

Accordingly, I find that 34 U.S.C. §§ 10153 and 10102 do not grant DOJ the power to condition the receipt of Byrne JAG grants on compliance with the FY 2018 immigration-related conditions.[11] Because Congress did not authorize DOJ to impose the challenged conditions, the conditions are *ultra vires* and violate the separation of powers doctrine.

### B. The Spending Clause

Colorado also argues that even if DOJ had the authority to impose the challenged conditions, they would nevertheless violate the Constitution's Spending Clause. While "Congress may attach conditions on the receipt of federal funds[,] [s]uch conditions must (among other requirements) bear some relationship to the purpose of the federal spending[.]" *New York v. United States*, 505 U.S. 144, 167 (1992) (internal quotation marks and citations omitted). Additionally, if Congress desires "to impose a condition on the grant of federal moneys, it must do so unambiguously . . . [to] enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).[12] Colorado persuasively argues that the challenged

---

[11] Likewise, the administrative regulation for federal grants cited by DOJ, 2 C.F.R. § 200.300, does not give it the authority to impose the challenged conditions. The regulation provides, in relevant part, that "[t]he Federal awarding agency must manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements: including, but not limited to, those protecting public welfare, the environment, and prohibiting discrimination." 2 C.F.R.§ 200.300(a). The text of the regulation is general and nothing in it authorizes the imposition of the challenged conditions. Moreover, an agency cannot write its own law. It may place into regulation only those powers that have been statutorily conferred by Congress.

[12] Legislation conditioning the receipt of federal funds must: "(1) pursue the general welfare; (2) impose unambiguous conditions on states, so they can exercise choices knowingly and with awareness of the consequences; (3) impose conditions related to federal interests in the program;

conditions are unrelated to the purposes of the Byrne JAG program and are impermissibly ambiguous.

### 1. Relatedness

Beginning with the notice and access conditions, DOJ claims that identifying and removing criminal aliens promotes crime prevention. *See* Defs.' Mot. at 31-32. Even so, the Byrne JAG program was designed to provide specified funding to state and local law enforcement for any of a wide variety of purposes falling within the eight broad program areas identified in the statute. *See* 34 U.S.C. § 10152(a)(1)(A)-(H). Immigration enforcement is not one of the eight program areas. Nor is it specified in the broad definition of "criminal justice" in 34 U.S.C. § 10251(a)(1).[13] Indeed, numerous district courts have found that the notice and access conditions are not sufficiently related to criminal justice to meet the relatedness requirement. *See City & Cty. of San Francisco*, 372 F. Supp. 3d at 947-48 ("I have already addressed why immigration enforcement conditions like the access and notice conditions were not sufficiently related to criminal justice to meet the relatedness requirement."); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 959 ("The Byrne JAG programs that are at risk of losing funding because of the access and notice conditions do not relate to immigration enforcement."); *see also City of Philadelphia*, 280 F. Supp. 3d at 643 ("Any relationship connecting [the Byrne JAG] program . .

---

and (4) not induce unconstitutional action." *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (citing *South Dakota v. Dole*, 483 U.S. 203, 207–08, 210 (1987)).

[13] "'[C]riminal justice' means activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency[.]" 34 U.S.C. § 10251(a)(1).

. and the conditions of requiring jail access to federal immigration authorities to interview alien

inmates and 48 hours' advance notice to federal immigration authorities of a noncitizen's release

from custody, is therefore difficult to discern.").

In considering whether a discernable relationship existed between immigration-related

grant conditions and the federal government's interest in the Byrne JAG program, the district

court in *City of Philadelphia* reasoned:

> Criminal law is integral to immigration law, specifying classes of noncitizens for
> high risk of removal, dictating procedures for detaining particular individuals
> pending removal proceedings, and defining who falls within the federal
> government's priorities for immigration law enforcement. However, immigration
> law does not impact the criminal justice system . . . [and] has nothing to do with the
> enforcement of local criminal laws. . . . [T]he fact that immigration enforcement
> depends on and is deeply impacted by criminal law enforcement does not mean that
> the pursuit of criminal justice in any way relies on the enforcement of immigration
> law. . . . Further, . . . the Byrne JAG statute is clearly designed for the purpose of
> enhancing local criminal justice. . . .The federal interest in enforcing immigration
> laws falls outside of the scope of the Byrne JAG program.

280 F. Supp. 3d at 641-42. I concur.

The notice and access conditions, which are intended to assist federal immigration

enforcement efforts, are not sufficiently related to the purpose of the Byrne JAG program to

assist state and local law enforcement in addressing the most urgent criminal justice matters in

their own communities. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 959 (citing

legislative history indicating that Congress intended to provide support to state and local

governments for any of the permissible purposes they were entitled to select).

Turning to the compliance condition, at least two courts have recognized some

relationship between the condition requiring compliance with § 1373 and the Byrne JAG

program goals. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal.

2018) ("[T]he [§] 1373 certification condition may have a sufficient nexus to the purpose of the

implicated funds, depending on the breadth of the federal government's interpretation of [§] 1373."); *City of Philadelphia*, 280 F. Supp. 3d at 644 (stating that the condition "appears to have some relationship with the JAG Program" and that the "relatedness issue" is a close call). However, neither of those courts held that the condition is indisputably related to the Byrne JAG program. The Northern District of California, in contrast, has explicitly ruled that the compliance condition, like the notice and access conditions, is unrelated to the purpose of Byrne JAG program funding. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 961; *see also City & Cty. of San Francisco*, 372 F. Supp. 3d at 948 (repeating that § 1373 is unrelated to the Byrne JAG program). The court found that, even assuming § 1373 is an "applicable law," the condition exceeds the bounds of the criminal justice purposes of the Byrne JAG program because § 1373 "applies to 'any individual,' including non-criminal immigrants and United States citizens alike." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 961 (citations omitted).[14]

I similarly find that, even if §§ 1373 and 1644 were "applicable laws" under the Byrne JAG statute, the condition requiring certification of compliance with those statutes exceeds the relatedness requirement in this context. For example, the Denver Housing Authority was intended to receive Byrne JAG funds for the purpose of offering high school credit and employment training for law-abiding teenagers living in public housing. *See* Pl.'s Mot. at 9, ¶ 2e (describing the Denver Housing Authority program for which FY 2018 Byrne JAG funds were requested). Requiring that organization to certify compliance with an immigration statute would be "the sort of overly attenuated or tangential relationship that arguably exceeds the relatedness requirement of grant conditions under the Spending Clause." *City of Philadelphia*, 280 F. Supp.

---

[14] Although § 1644 refers to any "alien in the United States" rather than "any individual," it would still apply to non-criminal immigrants. *See* 8 U.S.C. §§ 1373, 1644.

3d at 644 (critiquing the compliance condition as applied to public health workers) (internal quotation marks and citation omitted).

The questionnaire condition, which requires each applicant to provide information concerning its compliance with § 1373, is insufficiently related to the Byrne JAG program for the same reasons. *See City & Cty. of San Francisco*, 372 F. Supp. 3d at 948 ("[R]equiring the underlying information from grantees to assess their compliance with an inapplicable law like Section 1373 is equally unrelated.").

The harboring condition is a closer call. That condition requires Colorado to certify that it will not disclose confidential federal law enforcement information relating to harboring or shielding both "fugitive[s] from justice" and non-criminal aliens. *See* Grant Award Special Conditions ¶ 44, at 19. Protecting confidential law enforcement information relating to any criminal "fugitive from justice" has some relationship with Byrne JAG-funded criminal law enforcement programs. *Id.*; *see also City & Cty. of San Francisco*, 372 F. Supp. 3d at 948. However, the condition extends to any alien who has violated immigration law, even though some immigration violations are subject only to civil penalties. *City & Cty. of San Francisco*, 372 F. Supp. 3d at 949; *see also* 8 U.S.C. §§ 1182(a)(6)(A) & (9)(B), 1202(g), 1227(a)(1)(B). Therefore, while a portion of the harboring condition may be sufficiently related to the criminal justice purposes of the Byrne JAG program, the condition is overly broad and, as explained below, fails to satisfy the unambiguous requirement.

### 2. Ambiguity

DOJ argues that the proper inquiry here is "whether the conditions attached to federal spending are *themselves* ambiguous or readily understandable." Defs.' Reply at 24 (emphasis added). However, agency-imposed grant conditions, even if they themselves are unambiguous,

cannot be constitutional under the Spending Clause unless the statute from which they originate is also unambiguous. *See City of Philadelphia*, 280 F. Supp. 3d at 645-46 ("Spending Clause ambiguity cases generally involve statutory construction, not interpretation of conditions imposed by an agency."). Here, the underlying statutory authority, or lack thereof, for the challenged conditions cannot be ignored.

"Whether Congress unambiguously imposed the [grant conditions] (or unambiguously authorized the Attorney General so to do) entails largely the same inquiry as whether it conferred authority upon the Attorney General to impose them." *Id.* at 646. As I have already found, Congress did not expressly impose the challenged conditions in the Byrne JAG statute, nor did it authorize DOJ to impose them in any of the statutory provisions on which DOJ relies. Therefore, the challenged conditions "cannot have been unambiguously authorized by Congress" under the Spending Clause because they were never statutorily authorized to begin with. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 957 (quoting *City of Philadelphia*, 280 F. Supp. 3d at 646).

Furthermore, DOJ's conditions are not as unambiguous as it purports. For instance, it is unspecified and uncertain how broadly DOJ will interpret the compliance condition and the scope of the "information regarding . . . immigration status" encompassed by §§ 1373 and 1644. 8 U.S.C. §§ 1373(a), 1644. In similar litigation, DOJ expanded its interpretation of § 1373 beyond immigration status to include a detainee's release date, date of birth, residential address, location and contact information, and familial status. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 958. The court in that case reviewed DOJ's inconsistent representations and guidance and concluded that "DOJ's evolving interpretations of the [compliance] condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the consequences of their participation.'" *Id.* (quoting *Dole*, 483 U.S. at 207). Here,

while DOJ has not accused Colorado of having any laws or policies that violate §§ 1373 and 1644, there is uncertainty surrounding what policies or practices could be construed as restricting the sharing of information regarding immigration status.

The harboring condition is similarly ambiguous because it is not clear what constitutes an "indirect attempt" to conceal, harbor, or shield any alien or fugitive from justice. *See City & Cty. of San Francisco*, 372 F. Supp. 3d at 949 ("The [harboring] condition goes well beyond the DOJ's stated purposes . . . to require grantees to comply with the unexplained and unbounded discretion of the [Assistant Attorney General] to avoid 'indirect attempts' to disclose information.").

In sum, the challenged conditions violate the Spending Clause as neither the statutory authority for nor the scope of the conditions is sufficiently unambiguous to enable Byrne JAG applicants "to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

### C. The Tenth Amendment and the Challenged Conditions

Colorado further contends that 8 U.S.C. §§ 1373 and 1644 violate the Tenth Amendment's anticommandeering doctrine and therefore cannot be constitutionally applied to states or local governments.[15]

---

[15] DOJ urges me to sidestep this question, arguing that there is no need to reach the constitutionality of §§ 1373 and 1644 since Congress authorized DOJ to impose them indirectly through grant conditions. *See* Defs.' Mot. at 45; Defs.' Reply at 19. If, as DOJ contends, Congress had authorized it to impose the grant conditions, there is no unconstitutional commandeering so long as the state has "a legitimate choice whether to accept the federal conditions in exchange for federal funds." *State of New York*, 951 F.3d at 115 (quoting *Nat'l Fed'n of Indep. Bus. v. Sibelius*, 567 U.S. 519, 578 (2012)). "Pressure can turn into compulsion when the amount of funding that a State would lose by not acceding to the federal conditions is so significant to the States' overall operations as to leave it with no real choice but to agree." *Id.* In *State of New York*, the Second Circuit concluded that the plaintiffs' loss of Byrne JAG funds for FY 2017, which amounted to less than 0.1% of each state's annual budget, did not

Because conflicting state and federal policy priorities are at the heart of this litigation, at least some consideration of Tenth Amendment principles is warranted. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The anticommandeering doctrine, "driven by federalism, has emerged from this 'truism.'" *City of Philadelphia*, 309 F. Supp. 3d at 286 (quoting *United States v. Darby*, 312 U.S. 100, 124 (1941)). The Constitution was intentionally crafted to "confer[ ] upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. The anticommandeering doctrine "simply represents the recognition" that the Constitution purposefully "withh[e]ld from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, --- U.S. ----, 138 S. Ct. 1461, 1475-76 (2018). Accordingly, "even where Congress has the authority . . . to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166 (citations omitted).

The anticommandeering case law makes clear that the federal government "may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). Importantly, a federal statute may unconstitutionally intrude upon state sovereignty even if it does not require states to take any affirmative action. In *Murphy*, the Supreme Court rejected the proposition that a statute can run afoul of the anticommandeering doctrine only when Congress "command[s] 'affirmative' action

---

"represent[ ] so significant a percentage of their annual budgets as to cross the line from pressure to coercion." *Id.* Following this reasoning, I would be hard-pressed to conclude that the threatened loss of Colorado's FY 2018 award of $2,796,761 leaves it with no real choice but to agree to the challenged conditions. But unlike the Second Circuit, I find no statutory authority for DOJ's imposition of the challenged conditions, so my analysis does not lead down this path.

as opposed to imposing a prohibition." 138 S. Ct. at 1478. Thus, "[t]he basic principle [ ] that Congress cannot issue direct orders to state legislatures" applies regardless of whether the federal statute commands state action or precludes it. *Id.*

The anticommandeering doctrine serves three significant purposes. First, it "serves as one of the Constitution's structural protections of liberty" and ensures a "healthy balance of power between the States and the Federal Government . . . ." *Id.* at 1477 (internal quotation marks and citations omitted). Second, it "promotes political accountability" so that voters know whether a particular action or regulation is attributable to the federal government or to the state. *Id.* And third, it "prevents Congress from shifting the costs of regulation to the States." *Id.* However, the doctrine is not without limits. It "does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Id.* at 1478. In order for a federal statutory provision to preempt state law, it "must represent the exercise of a power conferred on Congress by the Constitution," and it "must be best read as one that regulates private actors." *Id.* at 1479.

With these principles in mind, I now turn to the federal statutes at issue. Sections 1373 and 1644 provide that states and local governments "may not . . . in any way restrict[ ]" their officials from sharing an individual's citizenship or immigration status with federal authorities. 8 U.S.C. §§ 1373(a)-(b), 1644. Despite being couched as prohibitions rather than affirmative commands, these provisions issue "direct orders" that "dictate[ ] what a state legislature may and may not do." *Oregon*, 406 F. Supp. 3d at 972 (quoting *Murphy*, 138 S. Ct. at 1478). The statutes also undermine political accountability by blurring the line between state and federal policy initiatives and priorities. *See New York*, 505 U.S. at 169 ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the

views of the local electorate in matters not pre-empted by federal regulation."). And, of particular concern to Colorado, the statutes shift the cost of compliance to state and local governments with limited resources, requiring them "to stand aside and allow the federal government to conscript the time and cooperation of local employees." *City of Chicago*, 321 F. Supp. 3d at 873; *see also* Thome Decl. ¶ 11(a) (explaining that Colorado has neither the funding nor the personnel to monitor and enforce compliance with the challenged conditions).

DOJ argues that §§ 1373 and 1644 merely preempt states and local governments from interfering with federal immigration regulation and enforcement. *See* Defs.' Mot. at 46. I disagree that §§ 1373 and 1644 are "valid preemption provision[s]" under *Murphy*. *See Murphy*, 138 S. Ct. at 1479. By their plain terms, the provisions affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption. Several district courts have considered §§ 1373 and 1644 after *Murphy* and have held that the provisions violate the Tenth Amendment. *See City of Evanston*, 412 F. Supp. 3d at 882; *Oregon*, 406 F. Supp. 3d at 971; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 949-53; *City of Chicago*, 321 F. Supp. 3d at 866-73.

Furthermore, there is an important difference between actively interfering and simply refraining from assisting with federal immigration enforcement. "States and localities have 'the right, pursuant to the anticommandeering rule, to refrain from assisting with federal enforcement efforts.'" *Oregon*, 406 F. Supp. 3d at 972-73 (quoting *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019)). Though not analyzing preemption in the context of a Tenth Amendment challenge, the Seventh Circuit aptly expressed the distinction between affirmative interference and refusal to aid in immigration enforcement, explaining:

> Some localities might choose to cooperate with federal immigration efforts, and others may see such cooperation as impeding the community relationships

necessary to identify and solve crimes. The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities.

*City of Chicago*, 888 F.3d at 282.

DOJ next argues that §§ 1373 and 1644 merely impose "information-sharing requirement[s]" and thus do not run afoul of the anticommandeering doctrine. Defs.' Mot. at 46. The question of whether a federal statute requiring only information-sharing is permissible under the Tenth Amendment has been left unanswered by the Supreme Court.[16] I need not resolve it here, however, because §§ 1373 and 1644 are "more than just [ ] information-sharing provision[s]." *Id.* at 872. While DOJ characterizes the statutes as innocuous reporting requirements, the practical effect of compliance with §§ 1373 and 1644 may be to "thwart policymakers' ability to extricate their state or municipality from involvement in a federal program." *City of Philadelphia*, 280 F. Supp. 3d at 651 (quoting *City of Chicago*, 264 F. Supp. 3d at 949). Indeed, §§ 1373 and 1644 "force[ ] states to allow their employees to participate in the federal scheme, shifting employee time—and thus corresponding costs—to federal initiatives and away from state priorities." *City of Chicago*, 321 F. Supp. 3d at 870. To fully comply with §§ 1373 and 1644, for example, a state would be unable to limit or control how much work time

---

[16] In *Printz*, the Supreme Court distinguished statutes "which require only the provision of information to the Federal Government" from those that require the state's participation "in the actual administration of a federal program." 521 U.S. at 918. However, the Court did not actually address the constitutional validity of information-sharing statutes or establish a Tenth Amendment exception for statutes that require states to share information. *Id.* (recognizing that some statutes "require only the provision of information to the Federal Government" but declining to address such statutes until "their validity is challenged in a proper case"). "In this way, the Supreme Court left open whether a federal law demanding 'only the provision of information to the Federal Government' or else imposing 'purely ministerial reporting requirements' violates the anticommandeering doctrine." *City of Chicago*, 321 F. Supp. 3d at 871 (quoting *Printz*, 521 U.S. at 918, 936).

employees spend assisting federal immigration agencies with their enforcement efforts. *See City of Chicago*, 264 F. Supp. 3d at 949 ("[L]ocal governments cannot both comply with Section 1373 and discipline an employee for choosing to spend his or her time assisting in the enforcement of federal immigration laws."). Thus, "federal priorities [would] dictate state action[,] and this inevitably reaches the state's relationship with its own citizens and undocumented immigrant communities in ways that no doubt will affect their perceptions of the state and trust in its law enforcement agencies." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 953. To the extent §§ 1373 and 1644 impermissibly intrude upon the functioning of state and local governments, then, they cannot be deemed constitutional in the name of "information-sharing." *See City of Chicago*, 321 F. Supp. 3d at 872 (citations omitted) ("A federal need for state information does not automatically free the federal government of the sometimes laborious requirement to acquire that information by constitutional means.").

In brief, while §§ 1373 and 1644 arguably offend the policy considerations supporting the anticommandeering principle, I stop short of ruling the statutes unconstitutional because I otherwise find the challenged conditions unlawful and need not do so.

### D. APA Challenges

Under the APA, courts must "hold unlawful and set aside" agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

Colorado raises three APA-related claims: (1) that DOJ exceeded its authority in imposing the challenged conditions; (2) that the conditions are not in accordance with law because they impermissibly conflict with 34 U.S.C. § 10228(a), which generally prohibits federal

control over state and local criminal justice agencies; and (3) that the conditions are arbitrary and capricious. However, I need not delve into the arguments regarding whether the challenged conditions violate § 10228(a) and are arbitrary and capricious because I have already found that DOJ lacked the authority to impose them.

In imposing immigration-related conditions that tie a state's Byrne JAG funding to its cooperation with federal immigration enforcement, DOJ went beyond what Congress permitted and intended it to do. *See City of Arlington*, 569 U.S. at 297–98 (observing that when determining whether an agency action is *ultra vires*, "the question . . . is always whether the agency has gone beyond what Congress has permitted it to do."). Thus, the challenged conditions are *ultra vires* and unlawful under the APA.

### E. Relief

In all, I find that the challenged conditions exceed DOJ's statutory authority and violate the separation of powers doctrine, the Spending Clause, and the APA. To remedy those violations, Colorado seeks declaratory, injunctive, and mandamus relief. Colorado is unquestionably entitled to a declaratory judgment reflecting my rulings here. I turn then to Colorado's requests for a permanent injunction and a writ of mandamus.

### 1. Injunctive Relief

Colorado seeks a permanent injunction prohibiting DOJ from enforcing the immigration-related conditions contained in the FY 2018 Byrne JAG grant on the State or the State's subgrantees. A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Because DOJ's imposition of the challenged conditions violates separation of powers principles and the Spending Clause, Colorado must either suffer constitutional injury or forgo Byrne JAG funds entirely. This is sufficient to establish irreparable harm for which monetary damages cannot adequately compensate. Furthermore, the hardship Colorado would suffer if it had to either accept unlawful conditions or lose out on critical funding outweighs the "little hardship" DOJ would suffer if it had to distribute Byrne JAG grants without the immigration-related conditions. *City of Evanston*, 412 F. Supp. 3d at 887 (citations omitted). Finally, it is in the public interest to enjoin the imposition of unlawful grant conditions, *see id.*, and an injunction would "bring[ ] clarity to all parties and to citizens dependent on public services." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 970 (quotation omitted).

Colorado is therefore entitled to permanent injunctive relief as to the challenged conditions contained in FY 2018 Byrne JAG grants.[17]

### 2. Mandamus Relief

Colorado seeks a writ of mandamus compelling DOJ to reissue Colorado's FY 2018 Byrne JAG award letter without the challenged conditions and to disburse the award funding without delay. The APA authorizes the reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Additionally, under the Mandamus Act, a federal court may "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "To be eligible for mandamus relief, the

---

[17] I need not consider the jurisdictional scope of the permanent injunction because Colorado does not seek nationwide relief. *Cf. City & Cty. of San Francisco*, 372 F. Supp. 3d at 953 (addressing whether injunctive relief should have nationwide scope).

[plaintiff] must establish (1) . . . a clear right to relief, (2) that the [defendant's] duty to perform the act in question is plainly defined and peremptory, and (3) that [plaintiff] has no other adequate remedy." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (citation omitted).

Colorado has a clear right to relief because DOJ lacks authority to impose the challenged conditions. Moreover, DOJ has a duty to allocate Byrne JAG funds pursuant to the statutory formula. As explained at length in this Opinion, Congress established a specific formula for allocating Byrne JAG funds to each state on an annual basis and carefully circumscribed DOJ's power to distribute or withhold funds. *See* 34 U.S.C. § 10156(a)(1) (stating that the Attorney General "shall . . . allocate" the total amount appropriated to states pursuant to the formula except as provided in § 10156(a)(2)); *id.* § 10157 (describing DOJ's authority to reserve a limited amount of the available funding for certain purposes); *see also Oregon*, 406 F. Supp. 3d at 976 ("Although the Attorney General is empowered to dictate the 'form' of an application and enforce the . . . unambiguous reporting, coordination, and programmatic requirements [in 34 U.S.C. § 10153], . . . he may not withhold funds if an applicant or grantee satisfies those objective criteria.").

Finally, no other adequate remedy is available. Colorado received its FY 2018 award letter in October 2018, yet no funds have been disbursed. As a result, Colorado remains unable to support identified programs and projects with crucial funding. The negative impact on public welfare, safety, and security cannot be cured by the granted injunction if DOJ is allowed to "simply sit on the funds." *Oregon*, 406, F. Supp. 3d at 976. Thus, Colorado is entitled to a writ of mandamus compelling distribution of its FY 2018 Byrne JAG award funding.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment (ECF No. 26) is DENIED, and Plaintiff's Motion for Summary Judgment (ECF No. 35) is GRANTED.

The parties shall confer and submit a proposed form of judgment and a proposed form of order with specific language for a declaration, permanent injunction, and writ of mandamus, consistent with this Opinion and Order. If the parties cannot agree on proposed language, they shall submit Plaintiff's proposed language with Defendants' revisions shown in redline, along with a joint statement explaining any disagreements. The proposed form of order and proposed form of judgment shall be submitted on or before May 15, 2020.

DATED this 23rd day of April, 2020.

_John L. Kane_
_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE